Jack Edward MILNER, Petitioner,

v.

Vicki Ann MILNER, Respondent.

No. 10–0776.

Supreme Court of Texas.

Argued Nov. 9, 2011.

Decided March 9, 2012.

Jeffrey H. Kobs, Kobs, Haney & Hundley, L.L.P., Fortworth, TX, Chris Harris, Harris * Cook, L.L.P., Arlington, TX, David Lee Cook, Harris Cook LLP, Mansfield, TX, for Jack Edward Milner.

John Charles 'J.C.' Ball, Law Offices John C. Ball, Fort Worth, TX, Heather Leah King, Koons Fuller, P.C., Southlake, TX, Rebecca Tillery, Koons Fuller, Dallas, TX, for Vicki Ann Milner.

Justice MEDINA delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice HECHT, Justice WAINWRIGHT, Justice GUZMAN, and Justice LEHRMANN joined.

The Texas Family Code provides for a mediated settlement agreement that ostensibly cannot be revoked after its execution provided certain formalities are followed. TEX. FAM.CODE § 6.602(b). If a mediated settlement agreement meets the formal statutory requirements, the trial court will not go behind the signed agreement to evaluate its merits but must render judgment on the parties' agreement. *Id.* § 6.602(c). The question here is whether the court of appeals erred in setting aside the underlying mediated settlement agreement, which the trial court purported to follow in its divorce decree.

The court of appeals concluded that the trial court erred in relying on the mediated settlement agreement when making the property division because there was no meeting of the minds regarding a material asset. 360 S.W.3d 519, 520 (Tex.App.-Fort Worth 2010) (mem. op.). The court reversed the trial court's judgment, in part, setting aside the mediated settlement agreement and remanding the marital estate for a new property division. We agree that the property division must be remanded for further proceedings and accordingly affirm the court of appeals' judgment. We do not agree with the court's decision to set aside the parties' mediated settlement agreement, however, as we explain below.

I

Jack and Vicki Milner married in 1994 and ceased living together in 2007, when Vicki filed for divorce. Their community estate included Jack's 44.055% limited partnership interest in Thelin Recycling Company and his 44.5% membership interest in Thelin Management, LLC. Thelin Management owns a 1% interest in Thelin Recycling and serves as its general partner. Both companies were formed during the parties' marriage.

Jack and Vicki signed a mediated settlement agreement (MSA) on July 3, 2008. In this MSA, Jack agreed "to transfer to Vicki all of his beneficial interest and record title in and to" Thelin Recycling and Thelin Management subject to existing liabilities and the Thelin Partnership Agreement. Vicki agreed to substitute herself for Jack by assuming the outstanding liabilities of both companies. Jack and Vicki further agreed to execute two exhibits, which were attached to the MSA and incorporated by reference. The two exhibits pertained to the two businesses, and the MSA referred to them collectively as the "Required Consents to Transfer of Record Title and Beneficial Ownership Interests."

The exhibits were likewise entitled "Required Consent to Transfer of Record Title and Beneficial Ownership Interests" followed by the name of the respective business and had signature lines for all of the owners. Exhibit A pertained to the recycling business and had signature lines for the general partner, Thelin Management Company, LLC, and all of the limited partners, which in addition to Jack included his brother, Joey Milner, and Michael Hill. As noted, the MSA was subject to Thelin's Partnership Agreement, which provided: "Neither record title nor beneficial ownership of a Partnership Interest may be transferred without the unanimous consent of all General Partner(s) and all Limited Partners ('Required Consent')."[1] Jack signed Exhibit A as a limited partner and as president of Thelin Management, the general partner, the same day he signed the MSA. He also signed Exhibit B as a member of Thelin Management that same day.

Joey Milner signed the exhibits four days after Jack and Vicki executed the MSA. Four days after that, Joey sold his interest in both Thelin Recycling and Thelin Management to Michael Hill. Hill never signed the exhibits to the MSA, thereby preventing Vicki from obtaining the consent required for her to become a limited partner.

On July 11, 2008, Jack filed with the trial court his draft of an Agreed Decree of Divorce. Vicki objected to the proposed decree, complaining that it did not comply with the MSA. Vicki argued that she was to assume Jack's status as a limited partner under the MSA, while Jack argued that the agreement only required him to assign his interest in the partnership. The draft decree reflected Jack's understanding of the MSA.

On July 17, a hearing was held to resolve the disagreement. At this hearing, the parties argued about the nature of the business interest Vicki was to receive in the recycling business and the meaning of the surrounding documents. After listening to the parties' arguments and their testimony, the trial judge announced that she would need to send them back to the mediator, stating:

> . . . I think there's been enough controversy here with looking at all the parts put together that I'm not sure that this agreement could be effectuated the way—the way it is now. Now, I'm going to send you back to [the mediator]. That's my ruling.

Despite this ruling, the trial judge continued to listen to arguments and ultimately decided to take the matter under advisement.

The next month, Vicki withdrew her consent to the MSA, prompting Jack to reurge his motion that the court enter

---

1. The partnership agreement defined "Required Consent" as "that percentage of Partnership Interest required to admit a new or substituted Limited Partner," which in Thelin's case was 100%.

his previously filed draft of the divorce decree. A few days later, the trial court signed the decree. Unlike the MSA, the divorce decree made no mention of "Required Consent" and contained no additional signature lines for the other partners. It merely provided for the assignment of Jack's partnership interest. Vicki moved for a new trial, which the trial court denied, and Vicki appealed.

The court of appeals affirmed the divorce but reversed the property division. 360 S.W.3d at 524. Although the MSA complied with Texas Family Code § 6.602, the court of appeals nevertheless set it aside, concluding that the trial court had abused its discretion when dividing the property because there had been no meeting of the minds regarding the nature of Vicki's transferred interest in the limited partnership. *Id.* at 524. The court accordingly remanded, in part, for a new division of the marital estate. Jack thereupon petitioned for review, complaining that the court of appeals erred in setting aside the MSA because it was a non-revocable agreement that the family code required the court to enforce.

## II

The Texas Family Code provides that a mediated settlement agreement, meeting certain statutory formalities, is binding on the parties and requires the rendition of a divorce decree that adopts the parties' agreement. Tex. Fam.Code § 6.602(b)–(c). In relevant part, the statute provides:

(b) A mediated settlement agreement is binding on the parties if the agreement:

(1) provides, in a prominently displayed statement that is in boldfaced type or capital letters or underlined, that the agreement is not subject to revocation;

(2) is signed by each party to the agreement; and

(3) is signed by the party's attorney, if any, who is present at the time the agreement is signed.

(c) If a mediated settlement agreement meets the requirements of this section, a party is entitled to judgment on the mediated settlement agreement notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law.

*Id.* Unlike other settlement agreements in family law, the trial court is not required to determine if the property division is "just and right" before approving an MSA. *In re Marriage of Joyner,* 196 S.W.3d 883, 889, 891 (Tex.App.-Texarkana 2006, pet. denied). And once signed, an MSA cannot be revoked like other settlement agreements.[2]

The MSA in this case satisfied the statutory formalities. Both parties signed the agreement, as did their respective counsel, and the agreement contains the following provision immediately above the signature lines:

**The parties acknowledge that this is a NON–REVOCABLE, BINDING Mediated Settlement Agreement entered into pursuant to Texas Law, and they understand that this agreement cannot be revoked for any reason whatsoever.**

---

2. As a general rule, a party may revoke its consent to a settlement agreement before the court renders judgment on the agreement. *Padilla v. LaFrance,* 907 S.W.2d 454, 461 (Tex.1995). An agreed judgment may not be rendered thereafter, although the revoking party may be liable for breaching the settlement agreement. *Ford Motor Co. v. Castillo,* 279 S.W.3d 656, 663 (Tex.2009). Mediated settlement agreements that comply with Texas Family Code § 6.602 are an exception to this general rule.

Under the statute, the MSA is therefore binding, and the parties are entitled to a judgment that conforms to their agreement "notwithstanding Rule 11, Texas Rules of Civil Procedure, or another rule of law." *Id.* § 6.602(c).

Several courts of appeals have interpreted the phrase "notwithstanding rule 11 or another rule of law" as not to "require a trial court to enforce a mediated settlement agreement simply because it complies with section 6.602(b), irrespective of what the agreement provides for or how it was procured." *Boyd v. Boyd,* 67 S.W.3d 398, 403 (Tex.App.-Fort Worth 2002, no pet.). These courts conclude that the statute does not require the enforcement of an MSA that is illegal in nature or procured by fraud, duress, coercion, or other dishonest means. *Morse v. Morse,* 349 S.W.3d 55, 56 (Tex.App.-El Paso 2010, no pet.); *Spiegel v. KLRU Endowment Fund,* 228 S.W.3d 237, 242 (Tex.App.-Austin 2007, pet. denied); *Joyner,* 196 S.W.3d at 890; *Boyd,* 67 S.W.3d at 403–05; *In re Kasschau,* 11 S.W.3d 305, 312 (Tex.App.-Houston [14th Dist.] 1999, orig. proceeding). This appeal does not involve allegations of fraud or dishonesty, and so we leave the applicability of those defenses for another case. The parties here merely disagree over the meaning of their MSA, that is, whether the parties intended for Vicki to assume Jack's status in the limited partnership or merely take an assignment of his interest. We turn then to that disagreement and its effect on the MSA.

### III

Jack argues that the MSA clearly conveyed only assignee rights in the limited partnership. Jack submits that even had the parties intended to substitute Vicki as a limited partner, the partnership agreement to which the MSA was subject prevented Jack from conveying a full partnership interest without the required consent of the limited partners. Because the MSA neither obligated him to obtain such consent nor conditioned the agreement on the consent of the other limited partners, Jack contends that only an assignment of his interest was intended.

Vicki contends that the MSA contemplated that she would take Jack's place as a limited partner and that their agreement was clearly conditioned on the "Required Consent" of the limited partners. She submits that the MSA cannot be enforced because one of the limited partners failed to consent to her admission as a limited partner. Vicki concludes that one of the MSA's material conditions cannot be performed, and therefore the court of appeals did not err in setting it aside.

 Although the parties present conflicting interpretations of the MSA, neither party presently contends that the agreement is ambiguous.[3] Whether a contract is ambiguous, however, is a question of law, and thus the parties' failure to raise the issue is not determinative. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). If the agreement's language can be given a certain and definite meaning, the agreement is not ambiguous, and the contract's construction is a matter for the court. *Chrysler Ins. Co. v. Greenspoint Dodge of Houston, Inc.,* 297 S.W.3d 248, 252 (Tex. 2009) (per curiam). But if the agreement is susceptible to more than one reasonable interpretation, the agreement is ambiguous, creating a fact issue on the parties' intent. *J.M. Davidson, Inc. v. Webster,* 128 S.W.3d 223, 229 (Tex.2003).

---

**3.** Vicki's trial counsel argued at the July 17 hearing that the MSA, among other things, was ambiguous, but she has not briefed the argument in this Court other than to state "that material terms of the MSA were not agreed to, and were in fact ambiguous."

The lower courts apparently agree that the MSA is unambiguous, however, their respective interpretations of the agreement are different. The trial court's judgment indicates that the MSA contemplated only an assignment of Jack's partnership interest, whereas the court of appeals' opinion states that the MSA "contemplated unanimous consent and therefore a limited partnership interest for Vicki." 360 S.W.3d at 524. The difference is significant because the rights of a limited partner are greater than those of an assignee of a limited partnership interest and this distinction may be reflected in the value of the respective interests as well. Because conflicting interpretations alone do not establish ambiguity, *Seagull Energy E & P, Inc. v. Eland Energy, Inc.*, 207 S.W.3d 342, 345 (Tex.2006), we begin with the language of the MSA to determine the nature of the partnership interest Jack agreed to transfer to Vicki.

### III

■ The MSA contains the following provision regarding the parties' interest in Thelin Recycling Company and Thelin Management Company:

> Jack *agrees to transfer* to Vicki *all of his beneficial interest and record title* in and to the 44.055% community property interest in Thelin Recycling Company, LP, and the 44.5% community property interest in Thelin Management Company, LLC, subject to all liabilities thereon, (except a portion of the mineral interests, as set out herein) and all provisions of the existing Partnership Agreement. The parties acknowledge that Thelin Recycling LP and/or Thelin Management, LLC, have outstanding debt relative to the operation of the business. Vicki agrees to substitute her name, for Jack's name, for all outstanding liabilities on both companies. The parties acknowledge that this agree-

ment is contingent upon the existing lender, or any successor lender, accepting Vicki as a guarantor in place of Jack on all existing liabilities of the Thelin businesses. Jack and Vicki *agree to execute the Required Consents to Transfer of Record Title and Beneficial Ownership Interests,* copies of which are attached hereto as Exhibit "A", and Exhibit "B", and incorporated herein fully by reference, at the same time this Agreement is executed.

(emphasis added). The MSA's Exhibit "A" contained signature lines for all of the partners and recited that:

> Thelin Management Company, LLC, Michael Hill, Jack Milner, and Joey Milner, being all of the partners of Thelin Recycling Company, LP, and constituting the Required Consent, hereby give their consent to such transfers of interest, effective this 3rd day of July, 2008.

Exhibit "B," a second form pertaining to Thelin Management Company, contained similar language and signature lines for its members. Jack plainly agreed to transfer his "beneficial interest and record title" in the partnership and management company, but the MSA does not explain what this entailed. The phrase is not defined in either the MSA or the partnership agreement.

■ The legal dictionary broadly defines "beneficial interest" as "[a] right or expectancy in something (such as a trust or an estate), as opposed to legal title to that thing." BLACK'S LAW DICTIONARY 885 (9th ed.2009). Similarly, we have said that "'beneficial interest' is profit, benefit or advantage resulting from contract or ownership of estate as distinct from legal ownership or control." *Satterlee v. Gulf Coast Waste Disposal Auth.*, 576 S.W.2d 773, 777 (Tex.1978) (citing *Christiansen v. Dep't of Soc. Sec.*, 15 Wash.2d 465, 131 P.2d 189

(1942)). Record title, on the other hand, typically refers to legal evidence of a person's ownership rights in property. *See Longoria v. Lasater,* 292 S.W.3d 156, 165 (Tex.App.-San Antonio 2009, pet. denied) (citing BLACK'S LAW DICTIONARY 1523 (8th ed.2004)). "Beneficial ownership" is defined as "[a] beneficiary's interest in trust property" or "a corporate shareholder's power to buy or sell the shares, though the shareholder is not registered on the corporation's books as the owner." BLACK'S LAW DICTIONARY 1215 (9th ed.2009). The term "beneficial ownership interest" that titled the MSA's exhibits does not appear in the legal dictionary nor does Texas law provide a clear definition. Thus, the MSA's references to both "beneficial interest and record title" and "beneficial ownership," standing alone, are consistent with either an assignment of the partnership interest or the transfer of full limited partnership rights.

The Thelin partnership agreement similarly recognizes that a person acquiring an existing partnership interest may do so by substitution as a full partner or by assignment. The partnership agreement characterizes these ownership transfers as either authorized or unauthorized, an authorized transfer being one to which all partners consent. The partnership agreement further contemplates that the transfer of assignee rights, that is, an unauthorized transfer, will typically be the result of the death, divorce, or incompetency of a partner.

As relevant to divorce, the agreement provides:

> In no event shall the . . . former spouse . . . become a Partner of the Partnership, nor be construed as a substituted partner, nor . . . have any voting rights as a Partner or any rights relative to the operations or management of the Partnership, except as provided in this Agreement and the [Texas Revised Limited Partnership] Act.[4]

But a former spouse, like any other person, can be substituted as a partner if the other partners consent. In the language of the partnership agreement: "Neither record title nor beneficial ownership of a Partnership Interest[5] may be transferred without the unanimous consent of all General Partner(s) and all Limited Partners ('Required Consent')." And this consent can "be withheld or granted in the sole discretion of those constituting the Required Consent."

In the MSA, Jack purported to transfer his beneficial interest and record title in the partnership to Vicki, which according to the partnership agreement could not be an authorized conveyance without the unanimous consent of his partners. But as Jack points out, the MSA did not expressly require him to obtain his partners' consent nor was it expressly contingent on the other partners agreeing to accept Vicki as a substitute partner. And so he concludes that the parties must have intended no

---

4. *See* TEX.REV.CIV. STAT. art. 6132a-1, § 7.02 (governing assignments of partnership interest) and § 7.04 (governing right of assignee to become limited partner). The Texas Revised Limited Partnership Act expired at the end of the 82nd Legislature, but it was in effect when the partnership was formed and during Jack and Vicki's mediation. This Act was replaced on January 1, 2010, by the Texas Business Organizations Code, which contains similar provisions governing limited partnerships in chapter 153. *See, e.g.,* TEX BUS. ORGS.

CODE § 153.251 (Assignment of Partnership Interest) and § 153.253 (Rights of Assignee).

5. A "Partnership Interest" is defined as "the ownership interest and rights of a Partner in the Partnership, including, without limitation, his right to a distributive share of the Profits and Losses, distributions, and the Property of the Partnership and the right to consent or approve."

more than an unauthorized assignment of his partnership interest.

Jack submits that had the parties intended for the MSA to be contingent on Vicki becoming a limited partner, it would have expressly addressed the matter as it did other contingencies. For example, Vicki expressly agreed to assume Jack's business-related debt and substitute herself as guarantor. The MSA provided that it was "contingent upon the existing lender, or any successor lender, accepting Vicki as a guarantor in place of Jack on all existing liabilities of the Thelin businesses." The lender apparently never agreed to this substitution because Jack subsequently waived the condition when seeking to have the trial court enter his draft of the divorce decree.

While we agree that an express condition or contingency like that involving the lender would have more clearly expressed the intent to transfer Jack's full partnership interest, we do not agree that its absence clearly confirms that the parties intended the contrary. If the intention were merely to assign Jack's partnership interest, the MSA might also have said so by designating Vicki as his assignee. Unlike "beneficial interest and record title," the partnership agreement defines the term "Assignee" as "a person who has acquired all or a portion of an interest in a Partnership Interest by assignment." The agreement further defines the term by referring to two sections of the Texas Revised Limited Partnership Act. The first referenced section provides that the assignment of a partnership interest does not entitle the assignee to become, or to exercise rights or powers of, a partner, but entitles the assignee to the allocations and distributions to which the assignor was entitled. TEX.REV.CIV. STAT. art. 6132a–1, § 7.02(a)(2)–(3).[6] The second provides that an assignee of a partnership interest may become a limited partner if and to the extent that the partnership agreement provides or all partners consent. *Id.* § 7.04(a).

Instead of simply assigning his partnership interest, Jack agreed to transfer "all of his beneficial interest and record title" to Vicki and "to execute the Required Consents to Transfer of Record Title and Beneficial Ownership Interests." Jack, of course, could not alone make Vicki a limited partner since there were other partners to consider. Nevertheless, the language chosen here at least implies that this may have been the parties' intent. Because the MSA purports neither to convey assignee rights nor limited partnership rights, its meaning is ambiguous and the parties' intent is therefore a question of fact.

As a fact question, the court of appeals could not substitute its reading of the MSA for that of the trial court. But neither was the trial court the appropriate authority to resolve the dispute. The MSA provided that the parties were to return to the mediator in the event of a dispute regarding the language in the Agreed Final Decree or other documents necessary to effectuate the MSA's terms. The MSA further provided that the mediator would arbitrate the dispute and make a final decision on the matter. This provision would appear to apply to ambiguities in the MSA itself, making the mediator, rather than the trial court, the appropriate authority to resolve this fact issue.

The dissent argues, however, that the MSA is not ambiguous, although it seems to agree that the meaning of Jack's "beneficial interest and record title" is unclear. The dissent recognizes that under the

6. The Texas Revised Limited Partnership Act was replaced on January 1, 2010, by the Tex-as Business Organizations Code. *See infra* n. 4.

partnership agreement neither record title nor beneficial ownership of a partnership interest could be "transferred without the unanimous consent of all General Partner(s) and all Limited Partners ('Required Consent')." 361 S.W.3d at 625 (quoting Article XIII, Section A of the Partnership Agreement) (Johnson, J., dissenting). But the dissent questions why the MSA was not conditioned on the unanimous consent of all partners, if the parties' intent was for Vicki to take Jack's place as a limited partner. *Id.* at 626. It finds this to be such a glaring omission that it cannot entertain any other interpretation. *Id.*

It is curious, however, why the MSA uses terms from the partnership agreement for the admission of a new or substitute limited partner, if its intent was merely to effect an assignment of Jack's interest. According to the partnership agreement, Jack's "beneficial interest and record title" in and to the partnership could only be transferred by unanimous consent, referred to in the agreement as "Required Consent". The partnership agreement further defined "Required Consent" as the "percentage of Partnership Interest required to admit a new or substitute Limited Partner. . . ." The MSA references to the conveyance as Jack's "beneficial interest and record title" and its incorporation of "Required Consent" suggests the admission of a substitute partner and conflicts with the dissent's view that only an assignment was intended. Moreover, there was no reason for Jack and his brother, Joey, to sign the Required Consent forms attached to the MSA, if Jack and Vicki intended only a bare assignment of Jack's interest. Jack was fully capable of assigning his interest in the partnership without these forms and without Joey's consent.

In the end, the dissent concludes that "it does not matter exactly what the terms [beneficial interest and record title] mean because regardless of what Vicki received, the Partnership Agreement was clear that she could not become a limited partner unless all the partners consented." *Id.* at 627. We, of course, agree that Vicki has not become a limited partner, but this observation misses the point. The issue is not what Jack was capable of transferring but what he promised to deliver. The answer to that question is not clear from the MSA's text and therefore the parties' intent is a question of fact.

\* \* \* \* \* \*

To sum up, we do not agree with the court of appeals' that the MSA unambiguously required Vicki's substitution as a limited partner nor do we agree that the MSA should be set aside merely because the parties interpret their agreement differently. We do agree with the court's decision to remand, however, because the MSA's ambiguity must be resolved before an agreed judgment can be rendered. The court of appeals' judgment is accordingly affirmed.

Justice JOHNSON filed a dissenting opinion, in which Justice GREEN and Justice WILLETT joined.

Justice JOHNSON, joined by Justice GREEN and Justice WILLETT, dissenting.

I agree with the Court's conclusion that the court of appeals erred by setting aside the divorce decree and the Mediated Settlement Agreement (MSA) on which it was based. But in my view the MSA is unambiguous, the trial court properly enforced it, and the case should not be remanded for further proceedings before the mediator. I would reinstate the judgment of the trial court. Because the Court does not, I respectfully dissent.

In interpreting an agreement we attempt to determine the true intent of the parties as it is expressed in the agreement. *Coker v. Coker,* 650 S.W.2d 391, 393 (Tex. 1983). We consider the entire writing and harmonize and give effect to all its provisions. *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 312 (Tex.2005). An agreement is unambiguous if its language can be given a certain or definite interpretation; it is ambiguous if applying relevant rules of interpretation to its facial language yields a genuine uncertainty about which of two or more reasonable meanings is the proper one. *Universal C.I.T. Credit Corp. v. Daniel,* 150 Tex. 513, 243 S.W.2d 154, 157 (1951).

Jack and Vicki Milner agreed that the terms of the MSA were to be the basis of and incorporated into their final decree of divorce. Accordingly, they, and the MSA, contemplated that Jack's interests in Thelin Recycling and Thelin Management would be transferred to Vicki by the final divorce decree. In support of the court of appeals' decision setting aside the decree, Vicki contends (1) the MSA required that she replace Jack as a limited partner in Thelin Recycling Company, L.P., (2) her being made a limited partner was a material condition of the MSA, and (3) the MSA was not effective because that did not occur. Jack contends (1) the MSA plainly provides only that he would transfer his rights in the Thelin entities subject to the Agreement of Limited Partnership of Thelin Recycling Company, L.P. (the Partnership Agreement), which did not allow him to make Vicki a partner in his place, and (2) the MSA neither says it is contingent on Vicki replacing him as a limited partner nor does it evidence an unwritten contemplation that it is, as the court of appeals determined.

The dispute arises from the first paragraph of a four-paragraph section of the MSA entitled "Business Interests." It provides as follows:

**Business Interests:**

Jack agrees to transfer to Vicki all of his beneficial interest and record title in and to the 44.055% community property interest in Thelin Recycling Company, LP, and the 44.5% community property interest in Thelin Management Company, LLC, subject to all liabilities thereon, (except a portion of the mineral interests, as set out herein) and all provisions of the existing Partnership Agreement. The parties acknowledge that Thelin Recycling LP and/or Thelin Management LLC, have outstanding debt relative to the operation of the business. Vicki agrees to substitute her name, for Jack's name, for all outstanding liabilities on both companies. The parties acknowledge that this agreement is contingent upon the existing lender, or any successor lender, accepting Vicki as a guarantor in place of Jack on all existing liabilities of the Thelin businesses. Jack and Vicki agree to execute the Required Consents to Transfer of Record Title and Beneficial Ownership Interests, copies of which are attached hereto as Exhibit "A", and Exhibit "B", and incorporated herein fully by reference, at the same time this Agreement is executed.

The referenced paragraph contains three fairly straightforward commitments. The first is by Jack; the second is by Vicki; and the third is jointly by Jack and Vicki:

1. *Jack agrees* to transfer all of his beneficial interest and record title in and to the 44.055% community property interest in Thelin Recycling Company, LP, and the 44.5% community property interest in Thelin Management Company, LLC, subject to all liabilities thereon, ... and all provisions of the existing Partnership Agreement.

2. *Vicki agrees* to substitute her name, for Jack's name, as guarantor for all outstanding liabilities on both companies, provided the lenders accept the substitution.

3. *Jack and Vicki agree* to execute, at the time the MSA is executed, the Required Consents to Transfer of Record Title and Beneficial Ownership Interests, copies of which are attached as exhibits.

Commitment two is not at issue; Jack waived Vicki's commitment to be substituted as guarantor on the Thelin debts. Pursuant to commitment three, Jack and Vicki executed the Required Consents. That leaves the commitment causing the difficulty: Jack's agreement to transfer all his beneficial interest and record title in the Thelin entities (except for some mineral interests not relevant to the dispute) to Vicki, "subject to all liabilities thereon . . . and all provisions of the existing Partnership Agreement."

The most relevant part of the Partnership Agreement is Article XIII, which is entitled "RESTRICTIONS UPON PARTNERSHIP INTERESTS." Article XIII, Section B.5 is entitled "Death, Divorce or Declaration of Incompetency of a Partner." It provides, in part, that in the event a partner is divorced and the partner's former spouse receives all or a portion of the partner's Partnership Interest, the partnership will not be dissolved. Rather, the former spouse receives the partner's right to share in the profits and losses of the partnership and to receive distributions of partnership funds; but

> [i]n no event shall the . . . former spouse . . . become a Partner of the Partnership, nor be construed as a substituted partner, nor shall such [former spouse] have any voting rights as a Partner or any rights relative to the operations or management of the Partnership, except

as provided in this Agreement and the [Texas Revised Limited Partnership Act].

Even though a former spouse cannot become a partner simply by transfer of the partner's interest, the Partnership Agreement provides a method by which a former spouse may become a partner. Article XIII, Section B.4 specifies:

> [A]ny successor to the Partnership Interest of a Limited Partner shall be admitted to the Partnership as a substitute Limited Partner only upon the (a) furnishing to the General Partners of a written acceptance in a form satisfactory to the General Partners of all the terms and conditions of this Agreement and such other documents and instruments as may be required to effect the admission of the successor as a Limited Partner; and (b) *obtaining the Required Consent. The consent may be withheld or granted in the sole discretion of those constituting the Required Consent.* The transferee shall be admitted to the Partnership as a substitute Limited Partner as of the effective date of the transfer.

(Emphasis added). Article IV of the Partnership Agreement defines terms used in the Agreement. "Required Consent" is defined as "that percentage of Partnership Interest required to admit a new or substitute Limited Partner as defined in Article XIII, Section A., of this Agreement." Article XIII, Section A specifies that "Required Consent" means unanimous consent of the partners:

> Neither *record title nor beneficial ownership* of a Partnership Interest may be transferred without the *unanimous* consent of all General Partner(s) and all Limited Partners ("*Required Consent* ").

(Emphasis added).

Thus, under the Partnership Agreement, regardless of what interest Jack agreed

would be transferred to Vicki in the divorce—all his partnership interest, all his record title and beneficial interest, or some other interest—she could not become a limited partner without the unanimous consent of all the partners of Thelin Recycling. And under the Partnership Agreement, consent could be "withheld or granted in the sole discretion" of the partners. Vicki does not claim that at the time the MSA was drafted and executed she was unaware of Article XIII's provisions; indeed, she could not make such a claim when the MSA explicitly made Jack's agreement to transfer his interests subject to the Partnership Agreement. Further, the attachment of and references to the Required Consents demonstrate that Vicki was fully aware that all the other partners had to agree before she would be admitted as a limited partner in Jack's place.

The Court says that "Jack, of course, could not alone make Vicki a limited partner since there were other partners to consider, nevertheless the language chosen here at least implies that this may have been the parties' intent." I agree in part: clearly, neither Jack nor the trial court could make Vicki a limited partner absent consent of the other partners. But, just as clearly, Jack's only commitment was that all his interest in the Thelin entities would be transferred to Vicki, subject to the Partnership Agreement's provisions. He did not commit to secure, or even to use his best efforts to secure, the unanimous consent of the other partners to admit Vicki as a limited partner, although Vicki says that he did, or at least she intended for him to do so.

Vicki asserts that referencing in and attaching to the MSA the Required Consent forms, which included signature lines for the other partners as well as for Jack and Vicki, reflects her position at the mediation and the agreement actually made:

she was to take Jack's place as a limited partner. The problem with her position is that nowhere in the language of the MSA is its effectiveness made contingent on either the other partners executing the Required Consents or a commitment by Jack to obtain their consents. Such an unexpressed contingency cannot reasonably be implied when the MSA required Jack and Vicki to execute the Required Consents the same day they executed the MSA, and the same Business Interests section of the MSA in which Jack agreed to transfer his Thelin interests contained explicit contingency provisions as to other matters. One of those, the provision making the MSA contingent on the Thelin businesses' lenders accepting Vicki as substitute guarantor for Jack, actually used the word "contingent." Other provisions in the Business Interests section specifically referenced the other partners having to agree in order for the provisions to be effective. One of those provided that Jack could purchase the pickup he was driving from Thelin for $20,000, "subject to the agreement of the other partners." Another part of the same section provided that Jack and Vicki, "along with the other partners of Thelin" would execute documents necessary to transfer certain mineral interests to Jack.

Moreover, in different sections of the MSA Jack specifically agreed to take certain actions to effectuate the property division. For example, he "agree[ed] to attempt to refinance" the note on the Lake House he was awarded, and he "agree[d] to obtain the signature of the appropriate party, on the appropriate form, necessary to release" Vicki's cell phone number to her, individually. The agreements Jack made were specific and detailed. His agreement that his interests in Thelin would be transferred to Vicki was likewise specific and detailed. It did not contain a requirement that Jack obtain the other

Thelin partners' signatures so Vicki would be a limited partner in Thelin Recycling.

To reach its conclusion that the MSA "implies" the parties "may" have intended it to be contingent on Vicki being admitted as a limited partner, the Court delves into the meaning of the terms "beneficial interest" and "record title" used in Jack's commitment in the MSA. The Court concludes that the MSA's use of the terms is reasonably "consistent with either an assignment of the partnership interest or the transfer of full limited partnership rights." I disagree with the Court's conclusion; but in the end it does not matter exactly what the terms mean because regardless of what Vicki was to receive, the Partnership Agreement was clear that she could not become a limited partner unless all the partners consented.

As the Court notes, the terms "record title" and "beneficial interest" are not defined in the MSA or the Partnership Agreement. But those phrases appear in the Partnership Agreement when it addresses transfer of a partner's interest. The context for their use in the Partnership Agreement compels the conclusion that the terms are intended to mean what they appear to mean: they encompass all the rights of a limited partner in the partnership. Their context in the Partnership Agreement also compels the conclusion that no matter what interest is transferred to the former spouse of a limited partner through a divorce decree—whether all or some, great or small, legal or equitable—the transferee cannot become a limited partner absent the existing partners' unanimous consent. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex.2009) (explaining that contract terms are given "their plain and ordinary meaning unless the instrument indicates the parties intended a different meaning"); *Heritage Res., Inc. v. Nations-*

*Bank,* 939 S.W.2d 118, 121 (Tex.1996) (noting that undefined words in an agreement are given their plain, ordinary, and generally accepted meaning unless the agreement shows the parties used them in a technical or different sense). So, the only reasonable construction of the MSA's use of the phrase "beneficial interest and record title" in relation to Jack's agreement that his interests in the Thelin entities would be transferred to Vicki is that the parties agreed on transfer of exactly what the MSA required: all his interests of whatever nature in the entities. But, likewise, the only reasonable construction of the MSA is that Jack and Vicki agreed the transfer of Jack's interests was subject to the Partnership Agreement's provisions.

On the other hand, it is not reasonable to read into Jack's agreement to transfer all his "beneficial interest and record title" to Vicki an implication that they agreed, without saying so in the MSA, that their agreement depended on her being made a limited partner in his place. Both of them knew neither Jack nor the trial court could make her one because the Partnership Agreement specified that the other partners had the sole discretion to admit her. The "Required Consents" exhibits to the MSA included signature lines for the other partners. But even though the MSA was detailed enough to specify that Jack and Vicki would execute the Required Consents at the same time they executed the MSA, the MSA wholly failed to reference the other partners' execution of the Required Consents or to make the MSA contingent on execution of them by the other partners. That omission can reasonably be interpreted only one way in light of the MSA provisions requiring the partners' approval or participation in other, seemingly less important, events: the MSA neither implies nor contemplates an agreement between Jack and Vicki that its effectiveness would be contingent on all the other part-

ners signing the Required Consents attached to the MSA so Vicki would be admitted as a limited partner.

As Jack points out, there is a big difference between an agreement that he would transfer his interests in the businesses and execute the Required Consents, which he had the authority to do, and an agreement that he would compel the other partners to consent to Vicki being admitted as a limited partner or for him to somehow make Vicki a limited partner, which he did not have the authority to do. It is not reasonable to interpret the MSA as *implying* Jack made the latter agreement—which is so important Vicki claims the entire MSA hinges on it—when the MSA clearly *expressed* he made the former agreement. Said another way, it is not reasonable to interpret the MSA as implying the parties agreed and intended, as an unexpressed material part of the MSA and on which it was contingent, for Jack to do something he had no legal authority to do when the MSA expressly sets out his commitment otherwise.

If Jack and Vicki agreed at the mediation that the MSA was contingent on Vicki being admitted as a limited partner, the omission of language expressing the contingency is inexplicable in the context of this divorce proceeding that must have included extended negotiations about property even before the mediation and the extensive, eight-page MSA addressing the property division agreement including such details as Jack's agreeing to obtain a signature of the appropriate party necessary for Vicki to retain her cell phone number. The failure to include language specifying that the MSA was contingent on the other partners' execution of the Required Consents is such a glaring omission it is unreasonable to interpret the MSA as possibly including such a requirement through finding ambiguity in what seems to me to be clear language. *See Frost Nat'l Bank*, 165 S.W.3d at 312.

In my view the only reasonable interpretation of the MSA is that it was not contingent on the other partners' executing the Required Consents. I would hold that because there are not two or more reasonable interpretations of the MSA language in question, the MSA is unambiguous and the trial court properly enforced it as written. *See Universal C.I.T. Credit Corp.*, 243 S.W.2d at 157.