

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00037-CV

SHAWN CANTRELL AND JAMIE CANTRELL, Appellants

V.

SANJAY SINGHANIA AND SAPNA SINGHANIA, Appellees

On Appeal from the 431st District Court
Denton County, Texas
Trial Court No. 24-7094-431

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice van Cleef

MEMORANDUM OPINION

Sanjay and Sapna Singhania, who wished to purchase a home owned by Shawn and Jamie Cantrell, executed a Family Residential Contract (Contract) and paid $35,000.00 in earnest money. The Singhanias were unable to secure the financing necessary to purchase the Cantrells' home and asked for the return of the earnest money pursuant to a Third-Party Financing Addendum (Addendum) to the Contract. After the Cantrells refused to return the earnest money, the Singhanias sued them for breach of contract. Both parties filed traditional motions for summary judgment. The trial court resolved the cross-motions in the Singhanias' favor, awarded them $35,000.00 in damages with pre-judgment and post-judgment interest, and awarded them $60,000.00 in attorney fees. The Cantrells appeal.[1]

On appeal, the Cantrells argue that the trial court erred by finding that the Singhanias proved their entitlement to summary judgment on their breach of contract claim as a matter of law because (1) the Cantrells complied with the Contract, (2) the Singhanias validly released all claims related to the Contract, and (3) the release cannot be reformed by the doctrine of mistake. We find that the Singhanias proved their breach of contract claim as a matter of law and that, under these unique circumstances, the release was invalidated because mutual mistake showed that there was no meeting of the minds to release earnest money to the Cantrells. As a result, we affirm the trial court's judgment.

---

[1]Originally appealed to the Second Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.). We follow the precedent of the Second Court of Appeals in deciding the issues presented. *See* TEX. R. APP. P. 41.3.

## I.  Factual Background[2]

### A.  The Contract Is Subject to Availability of Third-Party Financing

The Singhanias used their son, Aman Singhania, a real estate agent with Competitive Edge Realty, as their sales agent.  When the Singhanias located the Cantrells' sales listing, Aman reached out to Brooke Bengard, a real estate agent with RE/MAX DFW Associates, who represented the Cantrells.  On July 8, 2023, the Singhanias received pre-approval for a $2,400,000.00, thirty-year, fixed mortgage at 6.25% interest from Purelend Mortgage LLC.

On July 14, 2023, the Singhanias signed the Contract to purchase the Cantrells' property.[3] The Contract stated that they would pay $540,000.00 at closing, which was scheduled for August 11, 2023, and would obtain financing for the remaining $2,160,000.00 pursuant to a "Third Party Financing Addendum."

In a section labeled "EARNEST MONEY AND TERMINATION OPTION," the Contract specified that earnest money of $35,000.00 would be paid to the escrow agent, "National title - Kim Hill," and that the Singhanias had "the unrestricted right to terminate [the] contract by giving notice of termination to Seller within 5 days after the Effective Date of this contract."  The provision further stated, "If Buyer gives notice of termination within the time prescribed . . . any earnest money will be refunded to Buyer."  As to the earnest money and termination provisions, the Contract provided, "**Time is of the essence for this paragraph and strict compliance with the time for performance is required**."

---

[2]The facts recited are from the summary judgment proceedings.

[3]The Contract provided that the prevailing party "in any legal proceeding related to th[e] [C]ontract [wa]s entitled to recover reasonable attorney's fees and all costs of such proceeding."

3

The Contract further contemplated that the parties would make a demand for the earnest money and would sign a release in the event of timely termination by stating the following:

> DEMAND:  Upon termination of this contract, either party . . .  may send a release of earnest money to each party and the parties shall execute counterparts of the release and deliver same to the Escrow Agent. . . . If only one party makes written demand for the earnest money, Escrow Agent shall promptly provide a copy of the demand to the other party.  If Escrow Agent does not receive written objection to the demand from the other party within 15 days, Escrow Agent may disburse the earnest money to the party making demand . . . .

The Addendum, also signed by the Singhanias on July 14, required them to "apply promptly for all financing . . . and make every reasonable effort to obtain approval for the financing, including but not limited to furnishing all information and documents required by Buyer's lender."  The Addendum showed that the Singhanias would apply for a thirty-year, fixed mortgage loan in the principal sum of $2,160,000.00 "with interest not to exceed 6.500%," that time was of the essence, and that "[a]pproval for the financing . . . [would] be deemed to have been obtained when Buyer Approval and Property Approval [were] obtained."  Even so, the Addendum stated:

> This contract is subject to Buyer obtaining Buyer Approval.  If Buyer cannot obtain Buyer Approval, Buyer may give written notice to Seller within 14 days after the effective date of this contract and this contract will terminate and the earnest money will be refunded to Buyer.  If Buyer does not terminate the contract under this provision, the contract shall no longer be subject to the Buyer obtaining Buyer Approval.  Buyer Approval will be deemed to have been obtained when (i) the terms of the loan(s) described above are available and (ii) lender determines that Buyer has satisfied all of lender's requirements related to Buyer's assets, income and credit history.

4

**B.      Difficulties Arise in Obtaining Financing for the Singhanias**

Despite the Singhanias' pre-approval for a $2,400,000.00, thirty-year, fixed mortgage at 6.25% interest, on July 14, Pureland Mortgage sent a fee sheet for a $2,080,000.00, thirty-year, fixed mortgage at 6.99% interest. The fee sheet did not meet the terms of the Addendum, which showed that the interest was "not to exceed <u>6.500</u>%." To obtain financing with the terms stated in the Addendum, the Singhanias promptly sought to obtain third-party financing from Truist Bank, which preapproved a $2,160,000.00 loan at 6.25% interest. According to Aman's and Sanjay's affidavits,

> The Singhanias made every reasonable effort to obtain approval from Truist for the financing described in the Third[-]Party Financing Addendum, including furnishing all of the information and documents Truist requested. Specifically, throughout the loan application process, the Singhanias diligently responded to all of Truist's document requests and requests for other information. The Singhanias worked in good faith with Truist to secure approval for their mortgage application, including putting Truist in direct contact with the Singhanias' certified public accountant so that he could work directly with Truist to help Truist understand the Singhanias' complex financial situation, which included numerous properties, businesses, and cash flows.

Sanjay and Aman swore that, "[b]ecause of the complexity of the Singhanias' financial situation, Truist needed additional time to determine whether to approve the Singhanias' loan application," and they wished for the earnest money to be returned to them in case they were unable to secure financing.

**C.      The Singhanias Obtain an Extension of the Contract and Addendum**

Text messages between Aman and Bengard showed that on July 26, Aman informed Bengard that the Singhanias' finances were "tough to understand" since they "had to submit . . . nearly 20 entities that flow into [their] [Personal Financial Statement]." Aman represented that

5

"[g]iven the complexity of the assets and the large loan amount, the underwriters need[ed] time to determine if [the] financials merit[ed] a loan." Aman said that the Singhanias were not "willing to risk the earnest money in the scenario that Truist [could not] fulfill the loan." As a result, the parties began negotiating the extension of the third-party financing deadline to August 4.

On July 28, Bengard responded by telling Aman that the Cantrells were "asking $10k of the earnest money be signed over to them if [the parties] d[id] not close as stated in the contract." The Singhanias reviewed the Cantrells' offer to extend the deadline in exchange for release of $10,000.00 of the earnest money but declined because it was "very important" to the Singhanias that they would be able to recover the full amount of their earnest money. As a result, Aman told Bengard that the Singhanias were not comfortable with losing any of their earnest money. When Aman asked what documentation Bengard needed for the Singhanias to timely terminate the Contract, the Cantrells decided to extend the Contract deadline.

On July 28, the Cantrells agreed to and signed an Amendment to the Contract (Extension) stating, "The date for Buyer to give written notice to Seller that Buyer cannot obtain Buyer Approval as set forth in the Third Party Financing Addendum is changed to August 4, 2023." The Extension also provided that the Cantrells would "move [the] listing to Active Kickout until Financing Deadline. Should another offer be received, notification w[ould] be provided to the Buyer and the Buyer ha[d] 24 hours to remove any contingencies."

Bengard stated she

> understood from the Singhania's [sic] agent that the purpose of extending the deadline by which the Singhanias were to obtain financing to August 4, 2023, was

6

so that the Singhanias could attempt to secure financing and, if they were not successful in doing so, the earnest money would be returned to them were they to terminate the Contract by August 4, 2023.

**D.     The Singhanias Terminate the Contract for Lack of Financing**

On August 1, Truist informed the Singhanias that it could not approve their loan application because it was unable to verify their income and assets. That same day, the Singhanias sent a Notice of Buyer's Termination of Contract (Termination) form stating that the Contract was terminated because they could not "obtain Buyer Approval in accordance with the" Addendum and Extension.

On August 2, Aman sent a text message to Bengard to inform her that the Termination was in her email inbox because the lender was not able to confirm the Singhanias' finances. Bengard confirmed that she received the Termination on August 2, which informed the Cantrells that the Singhanias could not obtain buyer approval in accordance with the Addendum. In an effort to save the sale, Bengard responded by saying there was one "all cash" buyer as well as two other buyers that wanted to see the home. Even so, Aman texted Bengard to see if they could contact the title company to obtain the return of the earnest money.

Denise Carter, an escrow officer with National Title Group, sent an email to Hill, Aman, and Bengard on August 3, acknowledging both the receipt of the Termination and Aman's email requesting delivery of "the earnest money back to our accounts," but said the title company would need a release of earnest money form signed by all parties before releasing the earnest funds.

### E. A Release in Favor of the Wrong Party Is Signed

Bengard, who "was copied on a series of emails involving" Aman and the escrow agent, swore to the following facts:

- "Aman Singhania, Singhanias' agent, asked Denise Carter, the title agent, to 'Please let me know what you need from us to deliver the earnest money back to our accounts.' I understood this to mean that the Singhanias intended to have the earnest money returned to them."
- "When I informed the Cantrells that the Singhanias wished to have the earnest money returned to the Singhanias, the Cantrells directed me to prepare the Release of Earnest Money to release the money to their own accounts instead."
- "Given the Cantrells' request, I told them that was an option, but also informed them that the Singhanias might not sign a version of the Release that released the earnest money back to the Cantrells."
- "I informed the Cantrells that releasing the earnest money to the seller under these circumstances was not customary, however, they insisted, and I did as I was instructed."
- "At the time I prepared the Release of Earnest Money as the Cantrells instructed me to do, I was not aware of any basis for the earnest money to be released to the Cantrells instead of the Singhanias. I am currently not aware of any basis for the earnest money to be released to the Cantrells instead of the Singhanias."

Text messages between Bengard and the Cantrells show that Bengard prepared the Release according to the Cantrells' instructions but did not expect the Singhanias to sign it. The email from Bengard to Aman attaching the Release stated, "Please see the attached Release of Earnest money from my clients." Aman read the email and believed the Release memorialized the return of earnest money "from [Bengard's] clients."

The one-page Release of Earnest Money (Release) directed Hill to release the $35,000.00 to the Cantrells instead of the Singhanias and stated,

8

**This form provides for the release of the parties, brokers, and title companies from all liability under the contract (not just for disbursement of earnest money). Do not sign this form if it is not your intention to release all the persons signing this form from all liability under the contract. READ THIS RELEASE CAREFULLY. If you do not understand the effect of this release, consult your attorney BEFORE signing.**

The Release also said, "The undersigned Buyer and Seller release each other, any broker, title company, and escrow agent from any and all liability under the aforementioned contract."

Aman, who "was ill and travelling" filed an affidavit saying he electronically signed the Release but "did not notice that the Release was drafted to release the earnest money to the Cantrells instead of the Singhanias." Sanjay's affidavit says the Singhanias authorized Aman "to sign on [their] behalf a release that would release the earnest money to [them]," and did not give Aman "authority to sign . . . a release that would release the earnest money to the Cantrells."

On August 13, after the Singhanias had not received their earnest money, Aman reviewed the Release, realized his mistake, and informed Hill of the mistake, who said that the funds had already been released to the Cantrells. Contrary to Aman's affidavit stating that he electronically signed the Release, Aman's email to Bengard, Carter, and Hill stated that Aman "got the documents signed in a rush since [they] were busy traveling, but th[at] was a mistake." The email continued, "I simply assumed the release [Bengard] prepared would have the earnest money being released to the buyers, so I had it quickly signed." Aman then texted Bengard to ask why the earnest money was not returned to his parents since "[t]hat was the whole point of extending the financing deadline." Bengard said that when Aman notified her that the Release mistakenly released the earnest money to the Cantrells on August 13, she brought the matter to the Cantrells' attention, "but they stated that they would not be returning the earnest money to

9

the Singhanias." As a result, she texted Aman that the Cantrells were not going to return the earnest money.

## F.    Procedural Background

The Singhanias sued the Cantrells for breach of contract, but the Cantrells raised the affirmative defense of release. Both parties filed traditional motions for summary judgment. The Singhanias argued that they timely terminated the Contract and, as a result, were entitled to the return of their earnest money. They further argued that the Cantrells breached the Contract by instructing Bengard "to prepare a Release in direct contradiction to the terms of the Contract."

The Cantrells' motion for summary judgment argued that the Singhanias did not make every reasonable effort to obtain financing and had signed the Release, which provided that the earnest money would be sent to the Cantrells and released the Cantrells from any liability arising from the Contract. The Cantrells argued that the Release was valid regardless of Aman's unilateral mistake, that parol evidence could not alter the terms of the Release, and that the Release precluded the Singhanias breach of contract claim as a matter of law.

In support of their motion, the Cantrells attached Shawn's affidavit, which said that he received the Termination on August 3. Even so, because of the language of the Release, Shawn said, "[M]y wife and I read this [Release] as precluding us from seeking damages for the Singhanias breach of contract in not procuring financing, as the language of the release clearly states that both parties to the contract are released from liability."

10

After reviewing the evidence, the trial court granted the Singhanias' motion for summary judgment. The trial court's final judgment awarded the Singhanias $35,000.00 in damages, $60,000.00 in attorney fees, and pre-judgment and post-judgment interest.

## II. Summary Judgment

In this summary judgment case, the issue on appeal is whether the Singhanias met their summary judgment burden by establishing that no genuine issue of material fact existed and that they were entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). "We review a summary judgment de novo." *Mann Frankfort*, 289 S.W.3d at 848; *see Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010).

We take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort*, 289 S.W.3d at 848. We must consider whether reasonable and fair-minded jurors could differ in their conclusions in light of all of the evidence presented. *Wal-Mart Stores, Inc. v. Spates*, 186 S.W.3d 566, 568 (Tex. 2006) (per curiam) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 822–24 (Tex. 2005)).

11

The summary judgment will be affirmed only if the record establishes that the movant has conclusively "prov[ed] all essential elements of [the movant's] cause of action or defense as a matter of law." *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979). When, as here, both parties "move for summary judgment and the trial court grants one motion and denies the other," the reviewing court should review both parties' summary judgment evidence and "determine all questions presented." *Mann Frankfort*, 289 S.W.3d at 848. The reviewing court should "render the judgment that the [trial] court should have rendered." *Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n*, 300 S.W.3d 746, 753 (Tex. 2009) (quoting TEX. R. APP. P. 60.2(c)); *see Mann Frankfort*, 289 S.W.3d at 848.

## III.   Analysis

### A.   The Singhanias Established that the Cantrells Breached the Contract by Failing to Return the Earnest Money

To succeed on their claim of breach of contract, the Singhanias were required to show (1) "the existence of a valid [and enforceable] contract," (2) "performance or tendered performance," (3) breach by the Cantrells, and (4) "damages sustained as a result of the breach." *City of The Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 739 (Tex. App.—Fort Worth 2008, pet. dism'd).

Here, no party controverts the validity and enforceability of the Contract and Addendum. The evidence further shows that the Singhanias obtained an Extension to obtain financing. Although the Cantrells argued that the Singhanias failed to make every reasonable effort to obtain financing in accordance with the Addendum and Extension, they attached no evidence supporting that claim, and the record shows otherwise. In any event, the Singhanias timely

12

terminated the Contract, which expressly provided that "any earnest money w[ould] be refunded to Buyer." The evidence also shows that, in accordance with the provisions of the Contract, the Singhanias made a written demand for the return of the earnest money on August 3 from Carter and Hill and that the Cantrells made no such written demand. As a result, under the plain terms of the Contract, the escrow agent was to "disburse the earnest money to the party making demand."

Because the evidence conclusively establishes that the Singhanias were entitled to their earnest money pursuant to the terms of the Contract but that the Cantrells did not return the money, the summary judgment evidence established the Cantrells' breach and that, as a result, the Singhanias suffered actual damages of $35,000.00. Even so, that finding does not end our inquiry because we must now decide whether the invalidity of the Release was established as a matter of law.

**B.      Because There Was no Meeting of the Minds, the Release Was Invalid**

The Cantrells filed a traditional motion for summary judgment based on the Release. The Singhanias argue that the Release was invalid due to mutual mistake that was conclusively proved by the summary judgment evidence. Under the facts of this case, we agree with the Singhanias.

"Under Texas law, a release is a contract and is subject to avoidance, on grounds such as fraud or mistake, just like any other contract." *Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). "Pursuant to the doctrine of mutual mistake, when parties to an agreement have contracted under a misconception or ignorance of a material fact, the agreement will be

13

avoided." *Id.* Although the evidence shows that neither Bengard nor Cantrell were mistaken about the Release, the summary judgment evidence shows that Aman and the Singhanias were. "Unilateral mistake by one party, and knowledge of that mistake by the other party, is equivalent to mutual mistake." *Davis v. Grammer*, 750 S.W.2d 766, 768 (Tex. 1988). Since the summary judgment evidence shows that Bengard and the Cantrells knew the Release would, contrary to the provisions of the Contract, return the earnest money to the Cantrells instead of the Singhanias, we treat this case as raising the issue of mutual mistake.

The Cantrells argue that the plain language of the Release controls and bars the Singhanias litigation, but "[w]hen mutual mistake is alleged," as is it was here in the Singhanias' petition, "the task of the court is not to interpret the language contained in the release, but to determine whether or not the release itself is valid." *Williams*, 789 S.W.2d at 265; *see Bolle, Inc. v. Am. Greetings Corp.*, 109 S.W.3d 827, 833 (Tex. App.—Dallas 2003, pet. denied) ("Indeed, neither the language of the parties' release nor the legal effect of that language resolves the issue of mutual mistake."). "[W]e must determine whether the parties have made a mutual mistake by looking solely to objective circumstances surrounding the execution of the release . . . ." *Bolle, Inc.*, 109 S.W.3d at 835. Moreover, "[t]he parol evidence rule does not bar extrinsic proof of mutual mistake." *Williams*, 789 S.W.2d at 264; *see Myrad Props.*, 300 S.W.3d at 751.

Also, "[i]f the court determines a contract sets out a bargain that was never made, the contract will be invalidated." *Bolle, Inc.*, 109 S.W.3d at 833 (citing *Williams*, 789 S.W.2d at 264–65). Because "a meeting of the minds is a required element of a valid contract," "the absence of a meeting of the minds w[ill] justify a trial court's rejection of [a contract]." *Milner*

14

*v. Milner*, 360 S.W.3d 519, 524 (Tex. App.—Fort Worth 2010), *aff'd but criticized*, 361 S.W.3d 615 (Tex. 2012) (citing *Schriver v. Texas Dep't of Transp.*, 293 S.W.3d 846, 851 (Tex. App.—Fort Worth 2009, no pet.); *Mullins v. Mullins*, 202 S.W.3d 869, 877 (Tex. App.—Dallas 2006, pet. denied)); *see also City of The Colony*, 272 S.W.3d at 720 ("'Meeting of the minds' describes the mutual understanding and assent to the agreement regarding the subject matter and the essential terms of the contract." (quoting *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex. App.—Dallas 1999, pet. denied))).

The Cantrells argue that a genuine issue of material fact exists because Aman represented in his affidavit that he signed the Release on behalf of his parents, but an email shows that Aman had his parents sign the Release. Regardless of who signed the Release, the Singhanias' affidavits, text messages, and emails all show that the Singhanias demanded the return of their earnest money and believed that the Release accomplished that. There is no evidence to the contrary. Bengard, who knew that the Singhanias were entitled to their earnest money, prepared a Release that failed to comply with the terms of the Contract on the Cantrells' express instructions and attached the Release to an email stating, "Please see the attached Release of Earnest money *from* my clients." (Emphasis added). As a result, the summary judgment evidence showing the objective circumstances surrounding the execution of the Release conclusively established that the Singhanias did not agree to let the Cantrells keep their earnest money. For these reasons, the summary judgment evidence established mutual mistake as a matter of law.

15

We find that the Singhanias established their entitlement to summary judgment. As a result, we overrule the Cantrells' points of error.

## IV. Conclusion

We affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:    August 11, 2025
Date Decided:    September 18, 2025