**NEXSTAR BROADCASTING, INC. and Mission Broadcasting, Inc., Appellants**

v.

**FIDELITY COMMUNICATIONS CO., Appellee.**

No. 05–11–00220–CV.

Court of Appeals of Texas, Dallas.

Aug. 24, 2012.

Gail Ann Hayworth, John T. Cox, Alan Dabdoub, Lynn Tillotson Pinker & Cox, LLP, Dallas, TX, for Appellants.

John J. Reenan, David Fowler Johnson, Winstead, P.C., for Appellee.

Before Justices BRIDGES, FITZGERALD, and LANG.

## OPINION

Opinion By Justice LANG.

Nexstar Broadcasting and Mission Broadcasting (Licensees) appeal from a

take-nothing summary judgment respecting their breach of contract claim against Fidelity Communications. Licensees are owners of the broadcast licenses of four television stations, and Fidelity is the owner of a regional cable television system. Pursuant to their contract, Fidelity agreed to pay Licensees for the right to retransmit the signals of the four television stations to subscribers of Fidelity's cable systems. The central point of disagreement is how Fidelity's payment to Licensees is to be calculated under the agreement.

In two issues, Licensees argue the trial court erred in granting Fidelity's motion for summary judgment, denying Licensees' motion for summary judgment, and thereby concluding Fidelity's interpretation of

the payment terms of the agreement was the sole reasonable interpretation. We decide Licensees' issue against them and affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Licensees own the Federal Communication Commission licenses for operation of television broadcast stations KOLR and KSFX of Springfield, Missouri, and KFDX and KJTL of Wichita Falls, Texas. Each station has a unique broadcast signal and programming content. On December 31, 2008, Licensees entered into a Retransmission Consent Agreement (the Agreement) with Fidelity, the owner of a regional cable television system.[1] Under the terms of

---

1. The Agreement provides, in pertinent part:

### RETRANSMISSION CONSENT AGREEMENT

This Agreement is made as of the 31st day of December, 2008 by and between Nexstar Broadcasting, Inc., and Mission Broadcasting Inc., the licensees (or owner of licensees) of television broadcast stations KOLR and KSFX, Springfield, MO and KFDX and KJTL, Wichita Falls, TX (hereinafter, collectively, referred to as the "Station"), and Fidelity Communications, owner of a cable television system serving the communities of (See Attachment A) (hereinafter, said owner and system referred to collectively as the "System").

. . . .

1. Analog Carriage. The Station hereby consents to the nonexclusive retransmission of its entire broadcast signal in an NTSC format ("Analog Signal") for the term of this Agreement.

. . . .

2. Digital Carriage. The Station hereby consents to the nonexclusive retransmission of its entire broadcast signal in an digital (ATSC) format ("Digital Signal") for the term of this Agreement.

. . . .

3. Consideration: System agrees to make monthly payments to Station, due by the 10th day of the following month, per the schedule displayed as "Attachment B[.]"

. . . .

5. Copyright and Trademarks. Retransmission of the Station's Broadcast Signal pursuant to this Agreement does not convey any license or sublicense in or to the copyrights of and to the underlying programming transmitted by the Station.

. . . .

7. Warranties and Indemnities.

(a) The Station represents and warrants to the System that (i) the Station is owned by a corporation duly qualified to transact business and in good standing under the laws of the State of jurisdiction of its creation and qualified to transact business in the state(s) where the station broadcasts; . . . .

8. Force of Nature[.] Neither the Station nor the System shall have any rights against the other party hereto for any delay, preemption or other failure to perform when such delays, preemptions or failures are due to an act of God, inevitable accident, fire, lockout, flood, tornado, hurricane, strike or other labor dispute, act of government or governmental instrumentality (whether federal, state or local), failure of performance by a common carrier, failure in whole or in part in technical facilities, or any other cause (financial inability excepted) beyond such party's reasonable control. . . .

9. Termination. Either the Station or the System, in addition to all other remedies that may be available to it under this Agreement or under applicable law, may elect to terminate this Agreement, effective at any time, and be relieved of any further liabilities, by giving

the Agreement, Fidelity has been retransmitting the broadcast signals of Licensees' two Springfield broadcast stations to Fidelity's subscribers in three Missouri cities: Salem, Lebanon, and Rolla. Also, Fidelity has been retransmitting the signals of Licensees' two Wichita Falls broadcast stations to Fidelity's subscribers in Lawton, Oklahoma. Accordingly, each Fidelity subscriber in each location has been receiving the signals of two of Licensees' stations. In exchange, Fidelity agreed to compensate Licensees based, in part, on the number of Fidelity's cable subscribers.

This dispute arose in March 2009 when Licensees notified Fidelity that its monthly payments were less than the sum required by the Agreement. Fidelity disagreed and refused to change its calculation of the payments. This lawsuit followed.

Licensees claim Fidelity must pay a monthly fee specified by section 3 and Attachment B of the Agreement to each of the broadcast stations for each of Fidelity's subscribers receiving that station's signal. Pursuant to Licensees' interpretation, because each of Fidelity's subscribers receive two broadcast station signals, Fidelity must pay two of the monthly fees specified in the Agreement for each subscriber. Fidelity claims the Agreement makes no such requirement. Rather, Fidelity asserts, pursuant to section 3 and Attachment B, it need pay only one monthly fee for each subscriber and that is paid to Licensees, not the individual broadcast stations. This disagreement as to how Fidelity's payments are calculated stems, in particular, from the parties' disparate interpretations of the term "Station" in the Agreement's introductory sentence.

The term "Station" appears in this introductory sentence of the Agreement, which states:

*This Agreement is made as of the 31st day of December, 2008 by and between Nexstar Broadcasting, Inc., and Mission Broadcasting Inc., the licensees (or owner of licensees) of television broad-*

the other party written notice, if the other party has made a material misrepresentation or has materially breached its duties or obligations....

12. *Notices.* The System shall provide the Station with written notice of any changes in the System's operations or actions taken by the System which have a reasonable likelihood of affecting the System's performance under this Agreement....

  To the Station:
  Chief Executive Officer
  Nexstar Broadcasting Group, Inc.
  [Mailing Address of Nexstar]
  To the System:
  VP, Corporate Development
  Fidelity Communications
  [Mailing Address of Fidelity]
....

14. *Confidentiality.* Neither the System nor the Station shall disclose to any third party (other than its respective employees, in their capacity as such) the terms of this Agreement or any other confidential information provided by one party to the other during the Term of this Agreement....

**Attachment B**

**Schedule of Retransmission Compensation**

For In–Market Systems Serving Salem, MO, Lebanon, MO and Lawton, OK

Calendar year 2009: Total compensation to equal 30 cents per subscriber per month, with up to 15 cents per subscriber per month allowed in advertising expenditure.

Calendar year 2010: Total compensation to equal 33 cents per subscriber per month, with up to 15 cents per subscriber per month allowed in advertising expenditure.

....

For Out-of Market Systems Serving Rolla, MO

Calendar years 2009, 2010 and 2011: 10 cents per subscriber per month[.]

....

*Additional Payment Terms.* ... Advertising purchased by System shall be at the Station's customary rates provided to advertising clients purchasing a similar amount of advertising....

*cast stations KOLR and KSFX, Springfield, MO and KFDX and KJTL, Wichita Falls, TX (hereinafter, collectively, referred to as the "Station"),* and Fidelity Communications, owner of a cable television system serving the communities of (See Attachment A) (hereinafter, said owner and system referred to collectively as the "System").

(Emphasis added).

Our first step in addressing this dispute is to interpret the meaning of "Station." Licensees contend the language shows "Station" refers to each broadcast station individually—KOLR, KSFX, KFDX, and KJTL. Fidelity disagrees, contending the term "Station" in this introductory sentence refers to Licensees Nexstar and Mission. Our second step is to determine how, if at all, the meaning of "Station" directs calculation of Fidelity's payment under the Agreement. In that regard, we must consider section 3, titled "Compensation," and Attachment B to determine whether the Agreement unambiguously identifies a single method for calculating Fidelity's payment. Section 3 states, in part, "[Fidelity] agrees to make monthly payments to Station ... per the schedule displayed as 'Attachment B[.]' " Attachment B provides, in part, for "[t]otal compensation to equal 30 cents per subscriber per month" for subscribers in Salem, Lebanon, and Lawton and "10 cents per subscriber per month" for subscribers in Rolla.[2]

The dispute as to how fees are to be calculated is best described by setting out in detail how each party calculates the fees. Licensees assert because each subscriber receives exactly two signals, Fidelity should pay "compensation" per subscriber (as identified in Attachment B) of 30 cents per month for each signal re-

ceived for each subscriber located in Salem, Lebanon, and Lawton. This payment must be made to each "Station," i.e., each broadcast station, for the transmission of its signal. That total would be 60 cents per subscriber per month, for each subscriber in Salem, Lebanon, and Lawton. As to the Rolla subscribers, Licensees contend Fidelity should pay 10 cents per month per signal received, for a total of 20 cents per subscriber per month. As with the signals received in Salem, Lebanon, and Lawton, Licensees argue "Station," i.e., each broadcast station, must be paid this fee for the transmission of its signal. Of course, Fidelity disagrees, contending that "Station" refers to Licensees. Further, according to Fidelity, when one applies that meaning of "Station" to the compensation provisions (section 3 and Attachment B), one must conclude Fidelity should pay Licensees 30 cents per subscriber per month for those subscribers in Salem, Lebanon, and Lawton and 10 cents per subscriber per month for those subscribers in Rolla, not twice those sums per subscriber as argued by Licensees.

After discovery, both parties asserted that the Agreement was unambiguous and each moved for a favorable summary judgment. The trial court granted Fidelity's motion and denied Licensees' motion, entering a take-nothing judgment in favor of Fidelity. This appeal followed.

In their sole issue, Licensees argue the trial court erred in granting Fidelity's motion for summary judgment because Fidelity failed to demonstrate that "Station" is reasonably susceptible only to Fidelity's interpretation. Licensees make four specific, alternative arguments as to why the trial court erred in granting summary judgment in favor of Fidelity: (1) the

**2.** These terms apply to calendar year 2009. For subsequent years, the language is the same in Attachment B, although the fee per subscriber increases.

Agreement unambiguously supports Licensees' interpretation of "Station," which is the only reasonable interpretation; (2) none of Fidelity's interpretations of "Station" is reasonable; (3) Licensees' interpretation of "Station" is one of many reasonable interpretations, rendering the Agreement ambiguous; and (4) there is no reasonable interpretation of "Station," rendering the Agreement ambiguous. In response to all of Licensees' alternative arguments, Fidelity contends its interpretation of "Station" is the only reasonable interpretation, and the trial court properly granted its motion for summary judgment.

## II. STANDARD OF REVIEW

A party moving for traditional summary judgment under rule of civil procedure 166a(c) has the burden to establish that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Ysasaga v. Nationwide Mut. Ins. Co.,* 279 S.W.3d 858, 864–65 (Tex.App.-Dallas 2009, pet. denied). If the movant discharges its burden, the burden shifts to the nonmovant to present to the trial court any issues that would preclude summary judgment. *Hackberry Creek Country Club, Inc. v. Hackberry Creek Home Owners Ass'n,* 205 S.W.3d 46, 50 (Tex.App.-Dallas 2006, pet. denied). "When, as here, both parties move for summary judgment, each party bears the burden of establishing that it is entitled to judgment as a matter of law; neither party can prevail because of the other's failure to discharge its burden." *Id.* We review a traditional summary judgment de novo to determine whether a party's right to prevail is established as a matter of law. *Dallas Cnty. Tax Collector v. Andolina,* 303 S.W.3d 926, 929 (Tex.App.-Dallas 2010, no pet.). "A reviewing court may determine all questions presented; it may affirm the summary judgment entered, reverse and render a judgment for the other party, if

appropriate, or reverse and remand if neither party has met its summary judgment burden." *United Protective Servs., Inc. v. W. Vill. Ltd. P'ship,* 180 S.W.3d 430, 431 (Tex.App.-Dallas 2005, no pet.).

## III. APPLICABLE LAW

"In construing a contract, we must ascertain and give effect to the parties' intentions as expressed in the document." *Frost Nat'l Bank v. L & F Distribs., Ltd.,* 165 S.W.3d 310, 311–12 (Tex.2005). "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." *DeWitt Cnty. Electric Coop., Inc. v. Parks,* 1 S.W.3d 96, 101 (Tex.1999); *see Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.,* 294 S.W.3d 164, 168 (Tex.2009). "No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument." *Seagull Energy E & P, Inc. v. Eland Energy, Inc.,* 207 S.W.3d 342, 345 (Tex.2006). "We construe contracts 'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and 'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank,* 165 S.W.3d at 312 (quoting *Reilly v. Rangers Mgmt., Inc.,* 727 S.W.2d 527, 530 (Tex. 1987)).

"Whether a contract is ambiguous is a question of law that must be decided by examining the contract as a whole in light of the circumstances present when the contract was entered." *Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.,* 940 S.W.2d 587, 589 (Tex.1996). "Inartful drafting does not render a contractual provision ambiguous." *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 781 (Tex.2006). "When the provisions of a contract appear to conflict, we will attempt

to harmonize the two provisions and assume the parties intended every provision to have some effect." *United Protective Servs., Inc.*, 180 S.W.3d at 432. "If, after the pertinent rules of construction are applied, the contract can be given a definite or certain legal meaning, it is unambiguous and we construe it as a matter of law." *Id.; see Milner v. Milner*, 361 S.W.3d 615, 619 (Tex.2012). "A term is not ambiguous because of a simple lack of clarity. Nor does an ambiguity arise merely because parties to an agreement proffer different interpretations of a term. An ambiguity arises only after the application of established rules of construction leaves an agreement susceptible to more than one meaning." *DeWitt Cnty. Electric Coop., Inc.*, 1 S.W.3d at 100. Further, for an ambiguity to exist, two or more meanings must be reasonable. *Id.* "When a contract contains an ambiguity, the granting of a motion for summary judgment is improper because the interpretation of the instrument becomes a fact issue." *Coker v. Coker*, 650 S.W.2d 391, 394 (Tex.1983).

## IV. APPLICATION OF LAW TO FACTS

■■ In order to resolve this dispute, we must decide whether Fidelity's interpretation of this Agreement is the only reasonable interpretation. Licensees and Fidelity each offer several different arguments as to the meaning of particular sections of the Agreement and how the interpretation of those sections should direct us in our analysis. We consider each of these arguments in the context of the entire Agreement in an effort to harmonize and give effect to all provisions of the contract so that none will be meaningless. *United Protective Servs., Inc.*, 180 S.W.3d at 432; *Pratt–Shaw v. Pilgrim's Pride Corp.*, 122 S.W.3d 825, 829 (Tex.App.-Dallas 2003, pet. denied). However, we are not bound to the arguments suggested by the parties.

*See City of Bunker Hill Vill. v. Mem. Vills. Water Auth.*, 809 S.W.2d 309, 310 (Tex.App.-Houston [14th Dist.] 1991, no writ). It is our obligation to interpret the plain language of an agreement to give effect to the intentions of the parties. *See Frost Nat'l Bank*, 165 S.W.3d at 311–12. "Although [the parties] construe their obligations under this contract quite differently, a contract is not ambiguous merely because the parties disagree on its meaning." *Seagull Energy E & P, Inc.*, 207 S.W.3d at 345. Likewise, lack of clarity or even inartful drafting will not alone render an agreement to be ambiguous. *See In re D. Wilson Constr. Co.*, 196 S.W.3d at 781; *DeWitt Cnty. Electric Coop., Inc.*, 1 S.W.3d at 100.

### A. Construction and Interpretation of the Introductory Sentence

■ We begin, as do the parties, with the introductory sentence:

This Agreement is made as of the 31st day of December, 2008 by and between Nexstar Broadcasting, Inc., and Mission Broadcasting Inc., the licensees (or owner of licensees) of television broadcast stations KOLR and KSFX, Springfield, MO and KFDX and KJTL, Wichita Falls, TX (hereinafter, collectively, referred to as the "Station"), and Fidelity Communications, owner of a cable television system serving the communities of (See Attachment A) (hereinafter, said owner and system referred to collectively as the "System").

Licensees make two specific arguments about how this introductory language must be interpreted. First, Licensees stress the introductory sentence's use of the word "collectively" to support their contention "Station," as defined by the Agreement's introductory sentence, means the four broadcast stations. Specifically, they focus on the language that states, in part,

"... television broadcast stations KOLR and KSFX, Springfield, MO and KFDX and KJTL, Wichita Falls, TX (hereinafter, *collectively,* referred to as the 'Station'),...." (Emphasis added). Fidelity responds that "collectively" merely refers back to Licensees.

Second, Licensees contend that the placement of the comma, after the close of the parenthetical where "Station" first appears in the introductory sentence, demonstrates that "Station" necessarily refers to the individual stations. The part of the sentence at issue where the comma is placed states: "Nexstar Broadcasting, Inc., and Mission Broadcasting Inc., the licensees (or owners of licensees) of television broadcast stations KOLR and KSFX, Springfield, MO and KFDX and KJTL, Wichita Falls, TX (hereinafter, collectively, referred to as the 'Station'), [comma at issue] and Fidelity...." Further, Licensees advise that if Fidelity's interpretation (that "Station" refers to Nexstar and Mission) were correct, a comma should have been inserted before the "Station" parenthetical and directly following "Wichita Falls, TX." [3] In response, Fidelity argues the location of the comma does not demonstrate any special meaning. In fact, Fidelity points out commas are used in the introductory sentence in the same way for both parentheticals that follow each of the parties corporate names. Further, Fidelity notes there is a typographical error involving a comma in the introductory sentence that casts doubt upon the meaning of the placement of other commas. Specifically, a comma was erroneously omitted in Mission's name. The comma that should have been placed between "Mission Broadcasting" and "Inc." was omitted.

We address the use of the world "collectively." Licensees cite *Kupersmith v. Weitz,* No. 14–05–00167–CV, 2006 WL 3407832, at *1 (Tex.App.-Houston [14th Dist.] Nov. 28, 2006, no pet.) (mem. op.), and *Brock Independent School District v. Briones,* No. 02–07–00002–CV, 2008 WL 704174, at *1 (Tex.App.-Fort Worth Mar. 13, 2008, no pet.) (mem. op.), for the proposition that "collectively" is a "short-hand way of referring to each of the named individuals or things at once, but without creating an entity or a whole." In the language of the opinions in these two cases, the courts of appeals used the term "collectively" in a parenthetical following a simple list of parties or terms being discussed. Licensees continue their argument as to the meaning of "collectively" by citing a definition from a dictionary stating "collectively" means "denoting or representing a number of individuals or items." SHORTER OXFORD ENGLISH DICTIONARY 448 (5th ed.2002).

We interpret "collectively" to refer back to each party to the Agreement while "denoting a number of persons or things considered as one group or whole." WEBSTER'S NEW COLLEGIATE DICTIONARY 218 (1981). Further, "collectively" is used in a parenthetical. "Parentheses are normally used to provide some sort of explanation or qualification of other matter in the text." *In re O'Hara's Estate,* 549 S.W.2d 233, 237 (Tex.Civ.App.-Dallas 1977, no writ). As to the use of commas, we agree with Fidelity. In light of the construction of commas around the parentheticals that identify both parties and the obvious omission of a comma in Mission's corporate

---

**3.** Thus, Licensees contend to support Fidelity's interpretation, the clause should read as follows: "Nexstar Broadcasting, Inc., and Mission Broadcasting Inc., the licensees (or owner of licensees) of television broadcast stations KOLR and KSFX, Springfield, MO and KFDX and KJTL, Wichita Falls, TX, [comma inserted] (hereinafter, collectively, referred to as the 'Station'), and Fidelity...."

name, we cannot conclude the comma usage directs us to any special meaning.

We read the plain language of the introductory sentence to merely name, introduce, and describe the parties to this Agreement in similar ways. Nexstar and Mission are named as parties, and they are identified and described as the "licensees (or owner of licensees) of television broadcast stations ... (hereinafter, collectively, referred to as the 'Station')." The label "Station" is used to avoid the repetition of the full corporate names of the owners of the licenses of the broadcast stations. Likewise, Fidelity is named as a party to the Agreement and identified as the owner of the cable system that serves the specified communities. As with Nexstar and Mission, the label "System" is used to avoid the repetition throughout the Agreement of Fidelity's full corporate name. We conclude it is not reasonable to construe the term "collectively" or the comma placement as supplying a distinct meaning of the word "Station" as being the four individual broadcast stations.

### B. Analysis of Licensees' Argument: Interpretation of Sections 1, 2, and 5

Now, we address Licensees' position as to why the language of sections 1 and 2 of the Agreement, titled "Analog Carriage" and "Digital Carriage," respectively, and section 5, titled "Copyrights and Trademarks," support their interpretation of the term "Station."

*1. Analog Carriage and Digital Carriage*

Sections 1 and 2 of the Agreement are subtitled "Analog Carriage" and "Digital Carriage," respectively. Those sections state, in pertinent part, that the "Station" consents to the nonexclusive retransmission of its entire broadcast signal by Fidelity in both analog and digital format, and

Fidelity consents to retransmit the signals without degrading or lessening their quality. Both Licensees and Fidelity agree that only the broadcast stations have transmittable signals. However, Licensees suggest if Nexstar and Mission were inserted in sections 1 and 2 in place of "Station," the sections would state that Licensees consent to the retransmission of "their" signals. Licensees argue that, based upon this reading, the meaning of the language would not be reasonable because neither Fidelity nor Licensees contend that Nexstar or Mission have signals that can be retransmitted.

*2. Copyrights and Trademarks*

Section 5 of the Agreement, subtitled "Copyrights and Trademarks," reads in pertinent part: "Retransmission of the Station's Broadcast Signal pursuant to this Agreement does not convey any license or sublicense in or to the copyrights of and to the underlying programming transmitted by the Station." Licensees suggest if we replace the term "Station" in section 5 of the Agreement with Fidelity's proposed interpretation of that term, the altered sentence would state the "retransmission" of Nexstar's and Mission's Broadcast Signal ... does not convey any license...." As with sections 1 and 2, Licensees contend this interpretation of "Station" would tend to convey the meaning that the Licensees have broadcast signals, which the parties agree is not the case.

In summary, both of Licensees' illustrations as to why Fidelity's interpretation is untenable focus on the fact that Nexstar and Mission, in contrast to the four broadcast stations, do not have signals that can be retransmitted or copyrighted. However, we cannot agree that argument directs us to the interpretation of the term "Station" and the compensation terms.

While the language of sections 1, 2, and 5, *standing alone*, may reflect a conflict between the parties' understanding of the meaning of "Station," we cannot agree with Licensees that conflict creates an ambiguity. Those sections address "consent" to the use of the signals (sections 1 and 2) and reservation of copyrights and trademarks (section 5). As stated several times, Licensees are identified as "the licensees (or owner of licensees)." Accordingly, as "licensees" or "owners of licensees" of the broadcast stations, it follows and is reasonable to conclude Nexstar and Mission consent to the nonexclusive transmission of the signals of the broadcast stations (sections 1 and 2) and reserve the intellectual property rights (section 5). It does not reasonably follow that such consent and reservation of rights would need to be made by the broadcast stations, which are not parties to the Agreement. *See Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 243 S.W.2d 154, 158, 160 (1951) (concluding contract language that, standing alone, is not clear must be read in conjunction with other provisions of the agreement so as not to render the contract ambiguous).

## C. Analysis of Fidelity's Argument: Interpretation of Sections 7, 8, 9, 12, and 14

Fidelity directly responds to Licensees' approach of analyzing sections 1, 2, and 5 by arguing that the language of sections 7, 8, 9, 12, and 14 show Licensees interpretation is unreasonable. According to Fidelity, those sections make specific representations and agreements. Because the four stations are not parties nor third-party beneficiaries to the Agreement, it is not reasonable to read the term "Station" in those paragraphs to mean the four individual broadcast stations.

### 1. *Warranties and Indemnities*

Section 7 of the Agreement, subtitled "Warranties and Indemnities," reads, in pertinent part:

(a) The *Station represents and warrants* to the System that (i) the Station is owned by a corporation duly qualified to transact business and in good standing under the laws of the State of jurisdiction of its creation and qualified to transact business in the state(s) where the station broadcasts; (ii) said owner has the power and authority to enter into this Agreement and to fully perform its obligations hereunder; (iii) *said owner* is under no contractual or other legal obligations which shall in any way interfere with its full, prompt and complete performance hereunder; (iv) the individual executing the Agreement on behalf of the Station has the authority to do so; and (v) and [sic] the Station is in compliance with all applicable FCC Rules.

(Emphasis added).

We test Fidelity's argument by inserting into section 7 of the Agreement the call letters of the four broadcast stations, "KOLR," "KSFX," "KFDX," and "KJTL," in place of "Station." That being done, the sentence would state that the four broadcast stations make representations and warranties to Fidelity, the "System." However, as Fidelity indicates, an entity must be a party to a contract in order to make warranties to another. *Tex. Processed Plastics, Inc. v. Gray Enters., Inc.*, 592 S.W.2d 412, 415 (Tex.Civ.App.-Tyler 1979, no writ) (noting claim for breach of express warranty requires privity of contract); *see also Keith v. Stoelting, Inc.*, 915 F.2d 996, 999 (5th Cir.1990). Both Licensees and Fidelity agree that the four broadcast stations are not parties to the Agreement. It follows that Fidelity would have no right to enforce these covenants against any or all of the broadcast stations.

Licensees' suggested meaning of "Station" would not be reasonable in this section.

### 2. Force of Nature

Section 8 is titled "Force of Nature." It states, neither the "Station" nor Fidelity "have any rights against the other for any delay, preemption or other failure to perform when such delays, preemptions or failures are due to an act of God, inevitable accident, fire, . . . ." If the call letters of the four broadcast stations were inserted in place of the term "Station" in section 8, the sentence would state that Fidelity and the broadcast stations have no rights against one another in the event of nonperformance because of events identified in section 8. Yet, based upon this reading, because the broadcast stations are not parties to the Agreement, there is no agreement between them and Fidelity to the provisions of section 8. *See R.R. Comm'n of Tex. v. Coppock,* 215 S.W.3d 559, 566 (Tex.App.-Austin 2007, pet. denied) ("The doctrine [of force majeure] is designed to protect parties to a contract and excuses a party's nonperformance because of events outside the control of the parties."). As with section 7 as to warranties and indemnities, Licensees suggested meaning of "Station" would not be reasonable in this section.

### 3. Termination

Section 9 is subtitled "Termination." Section 9 states, in part: "Either the Station or [Fidelity] . . . may elect to terminate this Agreement, effective at any time, and be relieved of any further liabilities and obligations . . . ." If the call letters of the broadcast stations are inserted in place of the term "Station" in section 9, the sentence would state that the broadcast stations and Fidelity can terminate the Agreement. However, once again, this reading is not reasonable because Licensees' interpretation would give the broadcast stations, not Licensees, the right to terminate the Agreement. *See Threadgill*

*v. Farmers Ins. Exchange,* 912 S.W.2d 264, 267 (Tex.App.-Dallas 1995, no writ) ("When a contract expressly provides that it is subject to termination upon notice, each party to the contract has the legal right to cancel the contract.").

### 4. Notices

Section 12 is subtitled "Notices." It states, in part, that Fidelity shall provide the "Station" with written notice of any changes in Fidelity's operations or actions taken by Fidelity that have a reasonable likelihood of affecting Fidelity's performance under the Agreement. It directs all such notices to be sent by registered or certified mail to the CEO of Nexstar. Again, were the call letters of the broadcast stations to replace the term "Station" in section 12, the sentence would state that Fidelity must provide notice to the broadcast stations by mailing Nexstar's CEO. The fact that the broadcast stations are not parties to the Agreement does not raise the same difficulties in the interpretation of section 12 as with sections 7, 8, and 9. Certainly, the parties could provide that any notice would be sent to the broadcast stations through Nexstar. Yet, such an interpretation, while not inconceivable, is, at the very least, awkward. Reading this section in conjunction with these other sections described by Fidelity (sections 7–9), we cannot say Licensees' suggested meaning of "Station" would be reasonable in this section.

### 5. Confidentiality

Section 14 contains a confidentiality clause between Fidelity and the "Station." Consistent with our other exercises, we insert the call letters of the broadcast stations in place of the term "Station" in section 14. This causes the sentence to state that neither Fidelity nor the broadcast stations shall disclose to any third party the terms of the Agreement or any

other confidential information. As we observed above, respecting section 12, the notice provision, while it is not inconceivable that Fidelity may want to bind the broadcast stations to confidentiality, they are not parties to this Agreement and made no such agreement. It is not reasonable to interpret this section as being an agreement between the broadcast stations and Fidelity. *See Purnell, Inc. v. Thyssen Industrie AG Henschel Mixers Am., Inc.*, No. 01–95–00125–CV, 1995 WL 622919, at *5 (Tex.App.-Houston [1st Dist.] Oct. 19, 1995, no writ) (not designated for publication) (concluding that a party who did not sign a confidentiality agreement cannot be sued for disseminating trade secrets).

### D. Compensation under Section 3 and Attachment B

■ Our final step is to address Licensees' contention that a plain reading of section 3, titled "Compensation," in conjunction with Attachment B further demonstrates "Station" means the four broadcast stations and that the fees Fidelity is to pay are based upon the number of broadcast signals received by each of Fidelity's cable subscribers.

To argue this point, Licensees paraphrase section 3 in this way, "[Fidelity] agrees to make monthly payments to [KOLR, KSFX, KFDX, and KJTL (substituted for 'Station')] ... per the schedule displayed as 'Attachment B.'" Further, Licensees contend the specific language of Attachment B demonstrates payment is to be made to each individual station because "the provisions of Attachment B only make sense if they are read with a particular station in mind."

Licensees direct us to two provisions in Attachment B that they say demonstrate their point. First, Licensees refer us to the part of Attachment B regarding compensation for 2009, and the language "allowed in advertising expense": "Total compensation to equal 30 cents per subscriber per month, *with up to 15 cents per subscriber per month allowed in advertising expenditure.*" Second, we are directed to compare this "allowed in advertising expenditure" language to another paragraph in Attachment B titled "Additional Payment Terms." The language included in a sentence in that second paragraph states: "*Advertising purchased by System shall be at the Station's customary rates* provided to advertising clients purchasing a similar amount of advertising....*" (Emphasis added).

Licensees interpret the "allowed in advertising expenditure" language to mean: "Fidelity is given a certain monthly advertising allowance ... and Fidelity's advertising expenditure up to that allowance is calculated at the Station's 'customary rates.'" Fidelity, on the other hand, describes it by saying, "This means, in addition to paying Licensees the thirty cents per subscriber per month, Fidelity can choose to pay an additional amount and obtain advertising time." Further, Fidelity says this "allowance" is merely an "option" to purchase "up to" the specific sum per subscriber. Fidelity argues, regardless of the rate charged by a broadcast station, the "allowance" can be utilized.

We cannot agree with Licensees' interpretation. The first reference to advertising in the "total compensation" clause provides an allowance of "up to" the specified sum per subscriber. We agree with Fidelity that regardless of what rate is charged by any particular broadcast station, the allowance would apply to whatever rate is charged. Further, Licensees' contention about the meaning of the "customary rate" language has no application to calculating compensation regarding subscribers in the Rolla, Missouri area. The provision for

compensation as to Rolla subscribers merely says: "Calendar years 2009, 2010, and 2011: 10 cents per subscriber per month." "Calendar years 2012, 2013, and 2014: 15 cents per subscriber." There is no reference whatsoever to advertising expenditures or allowances.

We read the plain language of section 3 to describe the monthly payment as being "per the schedule displayed as 'Attachment B.'" "Attachment B" simply identifies the method of calculation of a sum of money to be paid to "Station," that is Licensees, on the basis of "30 cents per subscriber per month, with up to 15 cents per subscriber per month allowed in advertising expenditure" for Salem, Lebanon, and Lawton and "10 cents per subscriber per month" for Rolla and increased over time as specified in Attachment B. Neither the introductory sentence of the Agreement, which identifies the parties, section 3, Attachment B, nor any combination of those or the other provisions of the Agreement contain language that specifies Fidelity must pay a monthly fee to each broadcast station for each of Fidelity's subscribers receiving that station's signal. Licensees' interpretation is not reasonable.

## V.  CONCLUSION

We have considered the entire writing and attempted to harmonize and give effect to all the provisions by analyzing them with reference to the whole Agreement. *Frost Nat'l Bank*, 165 S.W.3d at 312; *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex.2003). We have construed the Agreement "'from a utilitarian standpoint bearing in mind the particular business activity sought to be served' and

'will avoid when possible and proper a construction which is unreasonable, inequitable, and oppressive.'" *Frost Nat'l Bank*, 165 S.W.3d at 312 (quoting *Reilly*, 727 S.W.2d at 530). As to the meaning of "Station" and as to the calculation of the compensation to be paid by Fidelity under the Agreement, we conclude the Agreement can be given a definite and certain meaning. As to those issues, the Agreement is not subject to two or more reasonable interpretations. Therefore, we construe the provisions as a matter of law and conclude the Agreement is unambiguous. *Milner*, 361 S.W.3d at 619; *Frost Nat'l Bank*, 165 S.W.3d at 312; *Webster*, 128 S.W.3d at 229. Accordingly, as a matter of law, we construe the term "Station" to mean Licensees Nexstar Broadcasting, Inc. and Mission Broadcasting, Inc. Further, as a matter of law, we construe the Agreement to state the compensation due from Fidelity under section 3 and Attachment B is calculated "per subscriber," payable monthly to Licensees and not, as Licensees contend, that Fidelity must pay a monthly fee to each broadcast station for each of Fidelity's subscribers receiving the station's signal. Accordingly, we conclude the trial court did not err in granting summary judgment in favor of Fidelity. We need not address Licensees' alternative arguments. Licensees' two issues are decided against them, and the trial court's judgment is affirmed.