# United States Court of Appeals for the Fifth Circuit

———————

No. 23-10048

———————

United States Court of Appeals
Fifth Circuit

**FILED**

August 20, 2024

Lyle W. Cayce
Clerk

The Kansas City Southern Railway Company,

*Plaintiff—Appellant*,

*versus*

Sasol Chemicals (USA), L.L.C.,

*Defendant—Appellee*.

———————————————————————

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:20-CV-53

———————————————————————

Before Southwick, Engelhardt, and Wilson, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

The plaintiff railroad entered a contract to construct and then lease a railyard to the defendant chemical company. This suit requires interpreting the term in the agreement regarding payment, which is calculated based on a set amount "per linear foot of track." Does "track" include the track making up the substantial number of track switches? The district court found the lease to be ambiguous, and then construed it not to require payment for the track that forms the switches. We find no ambiguity, interpret the agreement to require payment for the track comprising the switches, and REVERSE and REMAND.

## FACTUAL AND PROCEDURAL BACKGROUND

Sasol is a petrochemical company with facilities worldwide. The Kansas City Southern Railway ("KCS" or "KCSR") constructs and operates rail lines and owns property near Sasol's Lake Charles, Louisiana facility. In 2012, Sasol decided to expand its Lake Charles facility and needed a storage-in-transit yard to support the expansion. Such yards allow suppliers to load and store products in rail cars in preparation for rail transportation elsewhere. In 2013, Sasol invited KCSR to bid on the project.

On May 29, 2015, the parties executed what is titled the "Sasol Storage Track Lease," which we will call simply "the Lease." Its commencement date, which may have been an anticipated date for completion of the railyard, was December 1, 2017. The parties' basic obligations under the Lease are set out in Section 2.1:

> Pursuant to the terms of this Lease, KCS agrees to lease to Sasol and Sasol agrees to lease from KCS the surface area of certain land and other integral facilities and equipment as described in Schedule 1 – drawing "A" and/or Schedule 2, either existing or to be constructed by KCS at KCS's expense (the "Leased Premises").

The referenced Schedule 1 – drawing "A" ("S1DA") includes both a diagram of the railyard site and a table of measurements (the "Table"). The diagram depicts the tracks and switches KCSR would construct for Sasol, as well as the buildings, facilities, drainage ditches, and roads alongside those tracks. The rail lines on the diagram are dotted at the points where switches begin. Switches are "track structure[s] used to divert rolling stock from one track[s] to another."

The Table lists various amounts of track under two sub-tables. As relevant here, one sub-table is titled "Leased Premises Capacity" and includes computations for three different potential amounts of track feet (designated

"TF" in the Table) to be built by KCSR alongside the associated rail car storage capacities for those track amounts. The Table lists a variety of types of track feet, using abbreviations for lead and run-around track, rip track, engine track, and wash track. The Table refers to some portions of the track with the notation "Clr. Pt. to Clr. Pt.," which means "clear point to clear point" or "clearance point to clearance point." "Clearance point" refers to the space on a rail line where two train cars may safely be adjacent to each other; it is "unsafe for passage on an adjacent track(s)" beyond the clearance point. 49 C.F.R. § 218.93. As the parties agree, only clearance point to clearance point track may be used to store train cars. We refer to this track as "storage track."

KCSR submitted its first invoice to Sasol on November 2, 2017. It then sent invoices each year through 2021. Each invoice was for $16,572,042. Sasol disputed the charges, and each year it paid only $14,994,000.

At the heart of the parties' disagreement is Section 5.1 of the Lease. It provides that "on each anniversary of the Commencement Date . . . Sasol shall pay KCS One Hundred Two Dollars ($102) USD per linear foot of track included in the Leased Premises per year." The dispute, of course, concerns the number of linear feet of track. Sasol made its initial $14,994,000 payments based on 147,000 feet of track. That 147,000 feet figure is contained in a Lease contingency provision providing for what would happen if an inability to obtain the necessary permits hindered construction. Sasol had considered that figure to be the highest possible number of linear feet it might pay for under the Lease, and asserts it paid this amount only "in good faith of the long-term relationship" between the parties. KCSR argues the total is 162,471 linear feet, a figure which is said to correspond to the length of track actually laid. KCSR's figure includes the linear feet of the switches it constructed. Switches are not clearance point track, so Sasol cannot store rail cars on them. Sasol expected to be invoiced for only storage track.

No. 23-10048

KCSR filed suit on January 9, 2020, in the United States District Court for the Northern District of Texas because Sasol's principal place of business is Texas. Sasol answered and counterclaimed in March, seeking a declaratory judgment. Both sides sought summary judgment, which the district court denied. The district court concluded Section 5.1 was "ambiguous as a matter of law . . . as to whether the term 'track' included or excluded 'switches' and the associated track lengths for calculating rental payments."

After a bench trial in October 2022, the district court concluded the ambiguity "resolves in [Sasol's] favor," adopting Sasol's findings of fact and conclusions of law. These conclusions explain the ambiguity the district court found in the lease. We include the language below, omitting citations:

> The Court holds the Sasol Storage Track Lease entered into by KCSR and Sasol on May 29, 2015, contains an ambiguity. Specifically, in Section 4.1 of the Lease, KCSR agreed to construct "rail track infrastructure, switches and tracks that form part of the Leased Premises." In Section 5.1 of the Lease, KCSR agreed to invoice Sasol $102 "per linear foot of track included in the Leased Premises per year." As the trier of fact, it is the Court's duty to interpret this language and to determine whether the parties mutually intended the word "track" in Section 5.1 to mean "track" or, instead, to mean "track and switches."

The court then concluded the use of "track" elsewhere in the Lease, the negotiations leading up to the Lease's creation, the parties' conduct, and the parties' interpretation of the Lease all favored Sasol's stance: Section 5.1's reference to "f[ee]t of track" excludes footage for switches. The district court ultimately fixed rent at $14,806,932 — a smaller amount than Sasol had previously paid while relying on the contingency provision number — and awarded Sasol damages and interest for its previous overpayments.

KCSR timely appealed.

4

DISCUSSION

We interpret a contract *de novo*, which includes deciding whether the contract is ambiguous. *WBCMT 2007 C33 Off. 9720, L.L.C. v. NNN Realty Advisors, Inc.*, 844 F.3d 473, 477 (5th Cir. 2016). By contrast, when "the interpretation of the contract [by the district court] turns on the consideration of extrinsic evidence, such as evidence of the intent of the parties, we review for clear error." *Comar Marine, Corp. v. Raider Marine Logistics, L.L.C.*, 792 F.3d 564, 578 (5th Cir. 2015) (quotation marks and citation omitted). The Lease calls for the application of Texas law, and neither party challenges the validity of that choice of law provision.

First, we discuss Texas law on interpreting contracts. A court's role "is to determine, objectively, what an ordinary person using those words under the circumstances in which they are used would understand them to mean." *Endeavor Energy Res., L.P. v. Energen Res. Corp.*, 615 S.W.3d 144, 148 (Tex. 2020) (quoting *URI, Inc. v. Kleberg Cnty*, 543 S.W.3d 755, 764 (Tex. 2018)). In making that determination, "[t]ext is the alpha and the omega of the interpretive process." *Weaver v. Metro. Life Ins. Co.*, 939 F.3d 618, 626 (5th Cir. 2019) (citation omitted). Because of the centrality of text, Texas law places limits on the use of "facts and circumstances surrounding a negotiated contract's execution." *URI, Inc.*, 543 S.W.3d at 757. A court may not use these "surrounding facts and circumstances" to "make the language say what it unambiguously does not say" or "to show that the parties probably meant, or could have meant, something other than what their agreement stated." *Id.* (citations omitted).

That said, Texas law does permit consideration of "objectively determinable facts and circumstances that contextualize the parties' transaction." *Id.* at 757–58 (citation omitted). Such permissible considerations include "the commercial or other setting in which the

contract was negotiated and other *objectively determinable* factors that give a context to the transaction between the parties." *Id.* at 768 (emphasis in original) (quotation marks and citations omitted).

Second, because the district court concluded the Lease to be ambiguous,[1] we set out Texas caselaw on contract ambiguity. A contract is *not* ambiguous if it "is so worded that it can be given a definite or certain legal meaning." *First Bank v. Brumitt*, 519 S.W.3d 95, 104 (Tex. 2017) (quoting *National Union Fire Ins. Co. of Pittsburgh v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995)). If the contract is unambiguous, then a court must "construe the contract as a matter of law." *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983). If a contract is susceptible "to two or more reasonable interpretations," then it is "ambiguous as a matter of law" and its "meaning must be determined by a finder of fact, who may consider evidence of the parties' subjective intent." *Endeavor*, 615 S.W.3d at 148 (citations omitted). Importantly, "extrinsic evidence may only be used to aid the understanding of an unambiguous contract's language, not change it or 'create ambiguity.'" *URI, Inc.*, 543 S.W.3d at 757 (quoting *Community Health Sys. Pro. Servs. Corp. v. Hansen*, 525 S.W.3d 671, 688 (Tex. 2017)). An interpretation may be unreasonable if it would "create[] various absurdities throughout the" contract. *WBCMT*, 844 F.3d at 483. An absurd interpretation, then, cannot cause a contract to be ambiguous. *See id.*

The parties dispute the proper interpretation of Section 5.1, the Lease's pricing provision. As we already indicated, the dispute is whether the term "per linear foot of track" in that Section includes all rail laid —

---

[1] Neither Sasol nor KCSR contends the Lease is ambiguous; each instead asserts that its interpretation of the Lease is the correct one.

including non-storage track and switches — or does the term mean the length of storage track listed on the table of measurement in S1DA?

I.    *The parties' negotiations and prior drafts of the Lease*

Sasol's briefing extensively references the parties' negotiations and prior drafts of the Lease. Sasol focuses on negotiations and revenue calculations centering around the amount of storage track KCSR would provide. As we have discussed, not all types of track may be used as storage track. Sasol argues this evidence shows that Section 5.1's reference to "track" is limited to the storage track amounts listed on the Table.

Under Texas law, as previously explained, extrinsic evidence is never the place to start in interpreting a contract. If a contract is unambiguous, evidence of negotiations and prior drafts are prohibited by the parol evidence rule. *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 483–84, 502 (Tex. 2019). We first must determine whether the Lease is unambiguous without extrinsic evidence; if it is unambiguous, then it "must be enforced as written without considering extrinsic evidence bearing on the parties' subjective intent." *Devon Energy Prod. Co. v. Sheppard*, 668 S.W.3d 332, 343 (Tex. 2023). We therefore start with a close review of the relevant sections of the Lease.

II.    *Section 5.1 and the Leased Premises*

Sasol contends Section 5.1's pricing formula is tied to the storage track amounts listed on the Table. To understand whether that contention is correct, we closely examine that section.

Section 5.1 states that "Sasol shall pay KCS One Hundred Two Dollars ($102) USD per linear foot of track included in the Leased Premises per year." We then look for any relevant definitions. Section 1.1, the section of the Lease containing definitions, does not define "track" or "switch," so we

cannot immediately tell if one includes the other. Section 1.1 does, however, provide that the term "Leased Premises" shall have "the meaning given in [Section] 2.1." Section 2.1 defines the Leased Premises as "the surface area of certain land and other integral facilities and equipment as described in [S1DA] and/or Schedule 2, either existing or to be constructed by KCS at KCS's expense."

One problem with Sasol's interpretation, then, is that the Table — which is part of S1DA — only partially describes the Leased Premises. The divergence between the Leased Premises and the Table is illustrated by examining the use of "track" across the Lease and across the Table. The Lease refers to several types of track, including storage track, maintenance tracks, sidetracks and industrial spur tracks, rail tracks to the wash-bay location, stub-ended tracks, rip track, engine track, lead track, and receiving and departure tracks. The Table mentions only some of these. We examine Sasol's other arguments to see if they overcome what we have just discussed.

Sasol suggests a controlling similarity between Section 5.1's reference to "per linear foot of track" and the Table's "TF," or "track feet." That alleged similarity, Sasol argues, invokes the principle that "[s]pecific and exact terms are given greater weight than general language." *Silver Spur Addition Homeowners v. Clarksville Seniors Apartments*, 848 S.W.2d 772, 775 (Tex. App.—Texarkana 1993, writ denied). Though the Lease uses "track" in many places, Sasol argues that the use of "track" and a version of "feet" in both "per linear foot of track" and "track feet" is evidence that those terms "have a meaning different than 'track' alone." If the use of those two words in close proximity was a term of art, distinct in meaning from the Lease's other, numerous uses of the term "track" by itself, the text of the Lease gives no indication that was so. The Lease's definitional section, where one might expect to find support for Sasol's position, offers no definition of any relevant term.

KCSR's explanation of Section 5.1's "per linear foot of track" formula is more reasonable. It argues that "'[l]inear foot of track' is not a self-contained term of art or a defined term; it is the combination of a measurement denomination — 'linear foot'; the preposition 'of'; and the object 'track.'" We have no basis to carve off the Lease's use of "track feet" and "per linear foot of track" from its other uses of "track."

Sasol also suggests Section 5.1 must be understood in relation to the Table because otherwise the pricing provision will be insufficiently definite in its terms. Sasol relies on authority that "to be legally binding, a contract must be sufficiently definite in its terms so that a court can understand what the promisor undertook." *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 221 (Tex. 1992). Only that Table has a specific number in the Lease that could be used as the total linear feet of track, making it, according to Sasol, indispensable to the validity of the Lease. We conclude, though, that sufficient definiteness can be shown by provisions clearly explaining how annual lease payments will be calculated, even if factual disputes about the number of linear feet of track that were actually laid need to be resolved by agreement or litigation.

The Lease did not have to state an exact dollar amount because the use of a pricing formula that requires later input of data does not make a contract indefinite. For example, the Supreme Court of Texas has interpreted leases by oil and gas producers who paid royalties to the mineral owners during the life of the lease based on what the producers were actually paid as they sold the production. *Devon Energy*, 668 S.W.3d at 338. Interpreting Section 5.1 as allowing KCSR to be paid per linear foot for the track actually constructed, even if the total length was not set out in the Lease, does not cause the Lease to fail for indefiniteness.

Sasol disagrees that KCSR may charge for all track actually laid when Section 5.1 did not use the term "as-built," though that term appears elsewhere in the Lease. We do not see this as an inconsistency. Section 5.1 allows KCSR to charge for track within the Leased Premises, and the Leased Premises are a definite location: "the surface area of certain land and other integral facilities and equipment." Other provisions of the Lease confirm the Leased Premises' corporeal nature, such as Section 4.1's instruction that KCSR "shall undertake the *design and construction* of the Leased Premises." Because Section 5.1 allows KCSR to charge for track built within and on a tangible construct, it would have been redundant to specify "as-built" track.

Sasol similarly argues that Section 5.1 must rely on the Table because KCSR cannot reliably determine the amount of track footage constructed with either (1) computer-aided design ("CAD") files or (2) the diagram that is also part of S1DA alongside the Table. This argument sets an artificial limit on the sources for the information usable to show the linear feet of track. If the CAD files or a diagram in the Lease do not accurately reflect the length of track constructed, then the parties may show the length through some other relevant evidence. Nothing in Sasol's argument supports that the linear feet of track are inherently unmeasurable.

Sasol also argues that an examination of Section 4.7 confirms Section 5.1's reference to "f[ee]t of track" comes from the Table. Section 4.7 concerns the parties' contingency arrangements if the planned storage capacity were reduced because of permitting constraints. If permitting problems arose, "the first 73,056 feet of track on the Leased Premises and the New KCS Mossville Yard . . . shall be allocated to KCS." As Sasol observes, this 73,056 feet figure is also found on the Table. Sasol concludes from this that the "f[ee]t of track" contemplated by Section 5.1 must be the "track feet" provided by the Table. We are unpersuaded, because Section 4.7 speaks explicitly in terms of "storage capacity" and "storage track," while Section 5.1

contains no similar language qualifying the type of track for which KCSR may charge.

Sasol urges us to interpret Section 5.1 to be limited by the Table. Section 5.1, however, in plain text allows KCSR to charge for track included in the Leased Premises, and the Leased Premises and the Table are not equivalent.

There are other arguments, though, and we now consider those.

### III.    *The Lease's use of "track" and "switch" throughout*

Sasol argues that "[e]ven if" Section 5.1 were not tied to the storage track amounts listed on the Table, KCSR could not charge it for the footage of switches it has built. This would prohibit KCSR from charging for some 16,432 feet of the 162,471 track feet it claims to have built, amounting to a difference of $1,676,064 per year. KCSR argues that "switches" include the track within them, such that Section 5.1's reference to "f[ee]t of track" allows it to charge for both the footage of storage track it has built and the footage of switches it has built. Again, the Lease's definitional section does not define either "switch" or "track." We therefore examine the terms' plain meanings.

Dictionaries define "track" as "[a] continuous line of a pair of rails and the space between them, on which railway vehicles travel"; and "the parallel rails of a railroad." *Track*, n., sense I.6a, OXFORD ENGLISH DICTIONARY, https://doi.org/10.1093/OED/9004115261 (last accessed Aug. 6, 2024); *Track*, n., sense 2.d, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/tracks (last accessed Aug. 6, 2024). Dictionaries define "switch" as "[a] movable rail or pair of rails pivoted at one end, forming part of the track at a junction with a branch line, siding, etc., and used to deflect or 'shunt' a train, car, etc. from one line to another"; and "a device made usually of two movable rails and necessary

connections and designed to turn a locomotive or train from one track to an-other." *Switch*, n., sense I.3a, Oxford English Dictionary, https://www.oed.com/dictionary/switch_n?tab=mean-ing_and_use#19642889 (last accessed Aug. 6, 2024); *Switch*, n., sense 4, Merriam-Webster Dictionary, https://www.merriam-web-ster.com/dictionary/switch (last accessed Aug. 6, 2024).

These definitions support that switches, with their "pair[s] of rails," *include* track and are "part of the track."

Sasol does not use dictionary definitions to contest this understand-ing. Instead, it contends that the Lease itself uses "track" and "switch" throughout in a way that makes it clear one term does not include the other. We agree that clear text controls. *See Gonzales v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 736 (Tex. 1990). Sasol identifies several provisions throughout the Lease that, it asserts, support its argument that the terms are mutually exclusive; we have emphasized the relevant language:

> The area to be leased to Sasol under this Lease is shaded in yel-low in Schedule I — drawing "A" and shall include all integral facilities and equipment and the *track infrastructure switches and tracks* under this Lease, all as further described in Schedule 2 (the "Leased Premises").
>
> . . . .
>
> . . . KCS warrants that . . . the *track infrastructure, switches and track* on the Leased Premises shall be as specified in Schedule 2.

These quoted portions come from the third "whereas" section and Section 13.1(a). We add to them Sections 4.1 and 4.2, which address design and construction standards, and Section 7.2, which addresses Sasol's rights to make improvements. These sections likewise reference "track infrastruc-ture," "switches," and "tracks." Sasol concludes from these separate

references to "tracks" and "switches" that the terms must be understood to have distinct meanings, such that Section 5.1's reference to "f[ee]t of track" excludes footage for switches.

Four responses. First, one reasonable way to understand the uses of these terms is that at times, something needs to be explained, to be contracted for, as to each separate component of this railyard. That the terms have distinct meanings and sometimes need to be called out separately does not mean there is no overlap between them. Second, we have already found that the plain meaning of "switches" necessitates that they have track within them. Third, Section 2.1, which sets out the parties' basic obligations under the Lease, provides in part that "all track on the Leased Premises will be at least Class I track as defined by the Federal Railroad Administration, except for switches which shall be number 9 switches or larger." Thus, the rail used in switches is "track" under both the terms' plain meanings and this near-definitional use within the Lease. Finally, creating a hard distinction between "track" and "switch" in the Lease would produce absurd results. The following are some examples.[2]

Article 3 addresses the term of the Lease and its termination.

*Section 3.3.* This section allows Sasol to terminate the Lease with respect to all or portions of the Leased Premises. The notice of termination must specify:

> the location and number of linear feet of track that Sasol no longer wishes to lease. All track terminated under this [Section] 3.3 must be grouped in such a way that such track is contiguous and KCS has access to such track without being

---

[2] The Lease refers to its general provisions as "articles," and the subparts within those articles as "clauses." The parties refer to these subparts as "sections." We will too.

required to operate on track remaining under this Lease, other
than to access the Leased Premises.

Given the contiguity and access requirement, it would be more sensible for
"track" to encompass both storage track and the connected switch track.

Article 7 addresses maintenance, modifications, and improvements.

*Section 7.1(a).*  This section explains Sasol's inspection and mainte-
nance obligations.  It requires Sasol to

> inspect and maintain the track in the Leased Premises (includ-
> ing rail, ties, ballast and other track material and all track ap-
> purtenances and drainage). This obligation shall include,
> maintenance required as a result of normal wear and tear, re-
> pairs and track reconstruction as necessary in relation to Sa-
> sol's use of the Leased Premises.  All track maintained by Sasol
> hereunder shall be to at least Federal Railroad Administration
> Class I track standards pursuant to 49 C.F.R. Part 213 or such
> replacements standards as in effect from time to time.

*Section 7.1(b).*  This section requires Sasol to preserve its "property
under and adjacent to the track and/or upon which KCS's employees or con-
tractors may enter the Leased Premises pursuant to this Lease in safe condi-
tions including removal of snow, ice or other substances or materials that
might create a hazardous condition, elimination of any tripping or slipping
hazards."

*Section 7.7.*  This section addresses a potential dispute between the
parties over their duties under Article 7.  It provides for a "third party inspec-
tor [who] shall inspect those segments or portions of track in dispute."

Article 11 addresses liability and indemnification.

*Section 11.2.*  This section begins by stating that "except as otherwise
specified in this Lease, all loss related to the design, construction,

commissioning, operation, maintenance and use of the Leased Premises and track work on the Leased Premises shall be allocated as follows."

Article 14 addresses safety.

*Section 14.1.*　This section prohibits Sasol from putting any structure "in the Leased Premises closer to the track than the standard clearance requirements of KCS." It specifies that "[t]he standard clearances of KCS are (a) horizontally, nine feet (9') from the centerline of the track, and increased one and one-half inches (1-1/2") for each degree of curvature of the track, and (b) vertically, twenty-three feet (23') above the top of the rail of the track."

*Section 14.2.*　This section prohibits Sasol from constructing any installations "over or under the track" without KCSR's approval.

*Section 14.5.* This section requires Sasol to provide advance notice "[p]rior to performing any maintenance, repair, or reconstruction of the track on the Leased Premises as required or permitted by this Lease." It further notes that a flagman may be required, and

> [i]f KCS deems that flagging and/or other protection is needed, no such work shall be performed, and no person, equipment, machinery, tool, material, vehicle, or thing shall be located, operated, placed, or stored within twenty five (25) feet of the track or any other track of KCS at any time, for any reason, unless and until a KCS flagman is provided to watch for trains. **ROA.2018.**

Article 15 addresses compliance with the law.

*Section 15.2.*　This section provides that "if at any time Sasol is not in full compliance with any Laws as provided for in [Section] 15.1, KCS . . . may take whatever action is necessary to bring the track and any KCS property affected by such noncompliance into compliance with such Laws."

Article 17 addresses assignment of the Lease and use of the Leased Premises by third parties.

*Section 17.1.* This section states in part that "Sasol shall be solely responsible for all damages to the track, track material and underlying property in the Leased Premises or injuries caused by Sasol's switching operations." Excluding switches from the "track" referenced here would create a gap in the allocation of responsibility for damage.

Article 24 addresses hazardous commodities.

*Section 24.1.* This section provides that Sasol may use the "track" for the "shipping, receiving, handling, and storage" of hazardous materials. If Sasol so uses the "track," it "will comply with and abide by all applicable [Department of Transportation] regulations."

We conclude from our examination of these provisions that the Lease uses "track" such that the term is inclusive of switches. We acknowledge that this interpretation is not problem-free. It causes redundancy at the points where "track" is mentioned alongside "switches" and "track infrastructure." Nevertheless, "[i]nartful drafting does not render a contractual provision ambiguous." *Nexstar Broad., Inc. v. Fidelity Commc'ns Co.*, 376 S.W.3d 377, 381 (Tex. App.—Dallas 2012, no pet.) (quoting *In re D. Wilson Constr. Co.,* 196 S.W.3d 774, 781 (Tex. 2006)). These minor redundancies amount to inartful drafting, not ambiguity.

Treating "track" and "switch" as mutually exclusive, by contrast, would "create[] various absurdities throughout" the Lease. *WBMCT*, 844 F.3d at 483. Such a reading would produce gaps in the allocation of liability for injury and damage, in various rights and responsibilities regarding

maintenance, construction, and safety obligations, and in dispute resolution.[3] *Id.* That makes Sasol's proposed reading of the Lease unreasonable. *See id.* Because there is only one reasonable interpretation of the Lease — KCSR's — the Lease is not ambiguous. *See id.*

We hold the Lease unambiguously allows KCSR to charge for all track within the Leased Premises, including those within switches. We REVERSE and REMAND for proceedings consistent with this opinion.

_____

[3] Sasol's response is that these absurd results can be avoided by interpreting the Lease's references to "track" differently than "the specific 'foot of track' phraseology used in Section 5.1." For the reasons we explained previously, this distinction is untenable.